Refior Case.

306

Argued December 12, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*William J. Kenney,* with him *Roy T. Clark* and *Rose, Eichenauer, Stewart & Lewis,* for appellants.

*E. V. Buckley,* with him *Mercer & Buckley,* for petitioner, appellee.

*T. F. Ryan,* with him *S. C. Pugliese* and *Bialas & Ryan,* for Potter Title & Trust Company, guardian, appellee.

OPINION BY BALDRIGE, P. J., January 17, 1947:

Effie McNaughton on January 28, 1946, filed a petition with the Court of Common Pleas of Allegheny County, under the provisions of the Act of May 28, 1907, P. L. 292, as amended by the Act of April 1, 1925, P. L. 101, 50 PS §941. Section 1 provides that whenever any resident of this state "shall become insane or feeble-minded or epileptic, or so mentally defective that he or she is unable to take care of his or her property, and in consequence thereof is liable to dissipate or lose the same, and to become the victim of designing persons, it shall be lawful for either the mother, father, brother, sister, husband, wife, child, next of kin, creditor, debtor, or, in the absence of such person or persons, or their inability, any other person, to present to the court of common pleas of the county in which said person to be cared for resides, his or her petition. . . ."

The petitioner avers that she is a debtor, having in her possession personal property belonging to Otto Refior (now deceased), a resident of Pittsburgh, who was so mentally defective that he was unable to take care of his property and in consequence thereof was liable to dissipate or lose the same and become the victim of designing persons; that the nearest and only relatives of Otto Refior are E. M. and E. H. Refior, both residing

in Lansing, Michigan, and a sister, Sophia, of Toledo, Ohio. Service was had upon the relatives named, but no answer was filed. A hearing was held on February 13, 1946. The court, three days later, filed its opinion stating "that said Otto Refior, is now so mentally confused that he is unable to care for his property, and in consequence thereof is in such a mental condition that he is liable to dissipate or lose his estate or become the victim of designing persons." The Potter Title and Trust Company of Pittsburgh was appointed guardian of the estate of the alleged incompetent. Otto Refior died April 25, 1946. These three appeals by the sister and two brothers of the deceased followed.

The appellants' first contention is that the court below did not have jurisdiction to enter a decree as the petitioner is not a "debtor" or otherwise within the classes mentioned in the amendment of 1925, supra. Under the original Act of 1895, June 25, P. L. 300, neither "creditor" nor "debtor" was included among those entitled to petition for appointment of a guardian. "Creditor" was added by the 1907 Act, supra, and "debtor" by the 1925 amendment. A "debtor" is one who owes a debt, is liable under an obligation or is bounded to perform a duty. See Webster's New International Dictionary. In our Uniform Fraudulent Conveyance Act of 1921, May 21, P. L. 1045, §1, 39 PS §351, it is said a debt is "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." In the Pennsylvania Construction Act of 1937, May 28, P. L. 1019, Art. VIII, §101, 46 PS §601, a debtor, "unless the context clearly indicates otherwise", shall have the following meaning: "One who owes to another the performance of an obligation."

The petitioner testified that she had been elected secretary of the Allegheny Steel Forgings Company, practically all of which was owned by Otto Refior; that his

salary and hers were paid in cash and she deposited them in a safe deposit box; that later she became private secretary to Refior and had $43,000 in cash deposited in the safe deposit box, to which she had both keys, and other securities and personal property in her possession belonging to him. She stated further that he was indebted to her for money she loaned him to conduct his business and at the time of the hearing she held his promissory notes for her salary since 1939. No objection was made to this testimony, nor was it denied. The court was justified in determining that the petitioner is a "debtor" within the terms of the statute and legally qualified to apply for appointment of a guardian.

The appellants' next contention is that the court below did not possess jurisdiction to appoint a guardian as there was no estate to administer, the respondent having previously irrevocably transferred all his assets to a trustee. A brief reference to the historical background of this controversy seems advisable. There was evidence showing that E. H. Refior "had been fighting many years back" with his brother Otto, who was an adverse party in important litigation in Michigan; that within 8 or 9 months before this present proceeding was instituted he came to Pittsburgh two times, represented himself as acting for his brother, and had a lawyer draft trust agreements purporting to convey all of Otto's property to a trustee. After E. H. Refior returned home Otto revoked each of these trust agreements. When this same brother was notified of the proceeding now pending and that February 13, 1946, was fixed for a hearing, he came to Pittsburgh on February 6. He employed a new nurse for his brother and the regular nurse was told that she need not report for duty for several days. Otto's regular attorney tried to see him during this period but was physically barred from entering his room or communicating with him by telephone. An attorney was retained by E. H. Refior, who assumed again to act

for his brother, to write a third trust agreement. The first trust company consulted refused to accept an appointment as trustee because of this pending proceeding. The second trust company contacted agreed to serve. The last agreement, which purported to convey all Otto's property in trust, directed that the trustee was to pay the income to him for life or expend it or the principal for his benefit and the remainder at his death was given to his sister. It was taken to Otto Refior's hotel room where he was in bed, and, so far as the evidence discloses, he signed it 10 or 15 minutes after it was presented to him for the first time. When it was offered in evidence objection was made that it was signed by one incapable of executing such an agreement. The court, in admitting it, limited its purpose by saying: "I think the only thing material is whatever testimony Mr. Sauers [Vice President of the trust company named in the agreement] has given in reference to asking him questions and explaining to him, and he said he understood; and that is for what it is worth." Whatever evidential value it had, as thus restricted, related to Otto Refior's mental condition and not to the substance of the agreement. Furthermore, there was no allegation, or proof, of delivery of the trust res. The fair inference to be drawn from the testimony is that there was no delivery of Otto Refior's postal savings certificates, his money, or his certificates of stock in the Allegheny Steel Forgings Company and the Lansing Drop Forge Company, all of which is tangible property capable of physical delivery. The stock certificates were transferable under section 1 of the Uniform Stock Transfer Act of 1911, May 5, P. L. 126, which gives modes of transfer as follows: "(a) By delivery of the certificate, indorsed either in blank or to a specified person, by the person appearing by the certificate to be the owner of the shares represented thereby, or (b) By delivery of the certificate and a separate document containing a written

assignment of the certificate or a power of attorney to sell, assign, or transfer the same. . . ." to a specified person. Until the delivery of the tangible assets was consummated, the agreement, which was given without consideration, could have been revoked by Otto Refior. No motion was made upon the conclusion of taking testimony to dismiss the proceeding on the ground that the respondent had no assets. That matter apparently was not raised in the court below.

In Restatement, Trusts, §32, comment a, we find: "If the owner of property intends to make a gratuitous transfer of the property in trust but the title to the property does not pass to the intended trustee because the transfer is incomplete for want of delivery . . . of a deed of conveyance, no trust is created and the title to the property remains in the owner free of trust." It is well recognized that delivery is essential to the consummation of the creation of a trust and until that is done the transaction remains imperfect and is unenforceable: *Wallace's Estate,* 316 Pa. 148, 152, 174 A. 397; Scott on Trusts, Vol. I, §§32.1, 32.2.

It is stated in *Smith's Estate,* 144 Pa. 428, 436, 22 A. 916: "If the donor makes a third party a trustee, he must transfer to him the subject of the trust in such mode as will be effectual to pass the title. The transaction, as in the case of a gift, to be effectual must be accompanied by delivery of the subject of the trust, or some act so strongly indicative of the donor's intention as to be tantamount to such a delivery. . . ." In 65 C. J., Trusts, §74, it is said that the creator of a trust should "do everything which can be done, considering the character of the property comprising the trust, to transfer the property to the trustee in such mode as will be effectual to pass the legal title, as, for example, where delivery of personal property to a person is relied on as creating an express trust and constituting such person as trustee. The fund or other property must be

so designated as to permit the passing of title to the trustee." See, also, *Dickerson Appeal,* 115 Pa. 198, 8 A. 64; Perry on Trusts, 7th Ed., §100, p. 126; 54 Am. Jur., Trusts, §42. The attack by these appellants on the jurisdiction of the court is ineffective. Everything was not done which could have been done to transfer the settlor's tangible property, nor was it designated in the agreement.

The next position taken is that the trial judge in his decree did not follow the mandate of the Act of 1907, supra, and find that the alleged incompetent was so "mentally defective" that he was unable to care for his property, etc.; *Denner v. Beyer,* 352 Pa. 386, 42 A. 2d 747; *Ryman's Case,* 139 Pa. Superior Ct. 212, 11 A. 2d 677. The respondent at the time of the hearing was 70 years of age. He had suffered a cerebral hemorrhage in the month of May, 1943, which badly paralyzed his entire right side and initiated a progressive mental deterioration. Dr. Willetts, a physician of wide professional experience who attended Otto Refior for a number of years, testified that after he had this stroke he became difficult to handle, "his mind had deteriorated steadily, and that he was in bad shape now; . . ." and requires some person with authority to care for him and take complete charge; that in the latter part of 1945 his mental infirmities caused him to be incapable of conducting his own business and affairs and protect his property from possible designing persons. Dr. MacLean, a psychiatrist called in by Dr. Willetts to examine the respondent, testified that Refior was suffering from a state of mental deterioration, predicted that he would become progressively worse, that he did not know the day, date, month, or year, gave his age as 40 years, although obviously he was much older, and was "markedly confused" mentally. His conclusion as to Otto Refior's lack of ability to conduct his business and care for his property coincided with that expressed by Dr. Willetts.

At the end of the testimony the attorney for these appellants suggested that Judge McDonald, presiding at this trial, should alone interview the alleged incompetent in his room at the William Penn Hotel to aid in determining whether a guardian should be appointed. The other attorneys concurred in this suggestion and the judge made a call on the alleged incompetent, lasting 30 to 45 minutes. The opinion states: "Nothing developed in this conversation which changed or affected the court's opinion, which had been formed and based upon testimony heard in this case. And that opinion was that it was clearly necessary that a guardian be appointed for the estate of Otto Refior because it was clearly evident to the court that the condition of said Otto Refior was such that he was liable to become the victim of designing persons."

There was other proof that the respondent could not conduct or understand small and ordinary business affairs, such as the bills rendered for his meals, or use of the telephone, etc. Undoubtedly, there was enough evidence of his mental incapacity, to appoint a guardian.

The appellants contend further that whatever Otto Refior's mental impairment was the trial judge did not find it reached a degree required by the statutory mandate as a condition precedent for the appointment of a guardian of his property. As above noted, the decree states: "Otto Refior is . . . *so mentally confused* that he is unable to care for his property, and *in consequence thereof* is in such a mental condition that he is liable to dissipate or lose his estate or become the victim of designing persons." (Italics supplied). It would have been better if the language of the statute had been followed. The third section of the Act of 1907, supra, which is unamended, provides that after a hearing if the court is satisfied that person against whom the proceedings are taken is not able, owing to "weakness of mind", to take care of his property then a guardian shall be

appointed, so that the same phraseology is not used throughout the statute.

As we said in *Ryman's Case,* supra, p. 223, the purpose of the statute "is to protect the property of a weak-minded person and prevent its loss or dissipation at the hands of designing persons." We recognized in *Gerlach's Estate,* 127 Pa. Superior Ct. 293, 193 A. 467, that the statute was meant to protect a "feeble-minded" or "weak-minded" person. Is a person found to be "so mentally confused" as to be incapable of caring for his property and become the victim of designing persons, affected to an equal degree mentally as one who is "feeble-minded" or "weak-minded"? Webster's New International Dictionary gives "mentally confused" as synonymous with "mental disorder, derangement of functions," and states that in the realm of psychiatry it is regarded as a "mental state characterized by unstable attention, poor perception, disorientation, or inability to act coherently." Whether an alleged incompetent is found to be mentally "confused", "defective", "feeble", or "weak" is not vitally important. If, as here, it appears that one's mind is so affected that as a consequence thereof he is liable to dissipate or lose his property and become the victim of designing persons, the court, if other requirements are met, may appoint a guardian. We think the court's finding as to the mental condition of the respondent complied with the requirements of the statute.

The appellants in their last point assert that the lower court erred in entering an order on April 24, 1946, approving payment of $20,000, previously made by the guardian, Potter Title and Trust Company, and authorizing it to pay the further sum of $25,000 on account of fees alleged to be due S. C. Pugliese, Esq., under an agreement whereby he was to receive a 25% contingent fee for services rendered Otto Refior in collecting money due from the Lansing Drop Forge Company. That, in our judgment, was a final order and is appealable:

*Battery Park Bank v. Western Carolina Bank,* (N. C.)
36 S. E. 39. The question arises in view of the amount
involved whether this court has jurisdiction to determine
that matter. Under section 8 of the Act of 1907, supra,
any person who is aggrieved by the entry of a decree in
a proceeding brought under that statute may appeal to
this court. But that section must be read with section
6(b) of the same act, 50 PS §962, which provides, inter
alia: "Appeal and rehearing of the decree shall be al-
lowed in the manner and form now allowed in the cases of
decrees made in executors', administrators' and trustees'
accounts." That language refers to accounts filed by the
guardian. Therefore, if a contest arises over the guard-
ian's administration of the incompetent's estate and
more than $2500 is involved then the Supreme Court has
jurisdiction as in other cases where the amount involved
is in excess of our statutory jurisdiction. We, there-
fore, are of the opinion that this court does not have
jurisdiction over the last question raised. We have au-
thority, however, to certify that phase, which is separate
and distinct from those we have heretofore discussed,
to the Supreme Court: *Eslen's Estate,* 211 Pa. 215, 60
A. 733.

The motions to quash these appeals, on the ground
that the brothers and sister of the respondent are not
persons aggrieved within the language of section 8 of the
Act of 1907 supra, are denied: *Commonwealth ex rel.
Hibbert v. Davidson,* 269 Pa. 218, 220, 112 A. 115.

The order of the court in each of the three appeals
filed to Nos. 41, 42, and 43 April Term, 1947, are af-
firmed at the respective appellant's costs.

The issue raised by the appellants in the fourth
question, relative to the order of the court approving
and ordering payment of counsel fees to S. C. Pugliese,
Esq., is certified to the Supreme Court.