DuPuy Estate.

Argued April 13, 1950. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*J. Garfield Houston*, with him *John G. Kish* and *Blaxter, O'Neill & Houston*, for appellant.

*Clyde A. Armstrong*, with him *William D. Sutton* and *Thorp, Bostwick, Reed & Armstrong*, for appellee.

OPINION BY ARNOLD, J., July 20, 1950:

In October, 1940, the Court of Common Pleas of Allegheny County appointed the Fidelity Trust Company guardian of the estate of John DuPuy, upon the petition of his wife, Alma DuPuy. The appointment was made under the Act of 1907, as amended, 50 PS Sec. 941 et seq., on the allegation that he had become so "mentally defective that he is unable to take care of his property, and in consequence thereof is liable to dissipate or lose the same, and to become the victim of designing persons."

On May 14, 1948, DuPuy, averring that he had "become able to care for his property," petitioned the court to discharge the guardian and restore to him his real and personal property.

Even the evidence of the petitioner showed a series of mental derangements continuing into 1948, and usually accompanied with alcoholic excesses. The details need not be recited in full, but to the lay mind it seems apparent that he was mentally defective, and that designing persons had been victimizing him.

DuPuy and his witnesses gave evidence that he had not been drinking for some five months before the hearing, and that therefore his defective mind had been cured. But Mrs. DuPuy testified that he had been drinking in the hotel at Pittsburgh two days before the hearing.

The appellee called Dr. Henninger, a psychiatrist, who testified: ". . . one recognizes first that this man has had *at least* four episodes *of insanity* due to alcohol, four periods in which he was confused, hallucinated, imagined being followed, and hearing voices . . . in view of his past history in which there have been many periods longer than. . . [five months] of abstinence from drinking only to be followed by a relapse, I cannot feel that his change has been of sufficient duration for me to say he probably will not again resort to alcohol to the extent he might again become *insane*. . ." (Italics supplied).

In 1946 DuPuy left his wife in New York City and went to Canada. He there acquired a mistress, Rita Gendron, with whom he has since lived, and upon whom he has spent much money. She had an attorney in Montreal who had procured her a divorce. She took DuPuy to him for the purpose of having this guardianship terminated, and this attorney obtained a Canadian psychiatrist who had been his college roommate. At the hearing both expressed the opinion that DuPuy was able to take care of his property. All of the appointments with the lawyer and this psychiatrist were made by DuPuy's mistress. The attorney solicited Mrs. DuPuy to agree to a termination of the guardianship,

but she refused. Judge Weiss, who heard the case, well said: "With his [DuPuy's] new enthusiastic and energetic friends in Canada, this court is fearful of that very thing [DuPuy's victimization by designing persons]."

Appellant's principal contention is that he frequently got drunk and his inebriacy gave rise to all his delusions, insane actions and the dissipation of his property. From this it is argued that he was an inebriate.[1] But if DuPuy was mentally defective a guardian could be appointed whether or not he was an alcoholic or inebriate.

The Act of 1907 makes no mention of the *cause* of the defective mentality, and if that condition exists a guardian may be appointed and the guardianship retained whether or not the respondent is an inebriate. In *Refior Case*, 160 Pa. Superior Ct. 305, 314, 50 A. 2d 523, former President Judge BALDRIGE stated: "Whether an alleged incompetent is found to be mentally 'confused', 'defective', 'feeble', or 'weak' is not vitally important. If, as here, it appears that one's mind is so affected that as a consequence thereof he is liable to dissipate or lose his property and become the victim of designing persons, the court, if other requirements are met, may appoint a guardian."

The purpose of the Act is to prevent a mentally defective person from dissipating his estate and becoming the victim of designing persons,—whether they be Tom, Dick and Harry, or, as here, Jessie, Elly and Rita. While the mother of DuPuy testified in favor of discharging the guardian, she admitted that she had not seen her son for three or four years until within a few weeks before the hearing. She also admitted that in

---

[1] If only an inebriate the original petition might be brought under the Act of 1836, P. L. 589, 50 PS Sec. 691 et seq.

1945 he was not fit to control his property, and she favored the discharge only with the understanding that he voluntarily establish an agency account to protect his estate. As to the other witnesses for the petitioner, their observation of him was for relatively brief periods. Rita Gendron, with whom he had lived for three years, did not testify.

The lower court did not abuse its discretion in refusing to discharge the guardian "without prejudice to the petitioner to file another petition ... at a future date. . ."

The petition to discharge the guardian was filed May 14, 1948. During the taking of testimony the petition was amended by averring that the original order appointing the guardian "lacked evidence to support it other than the consent of John DuPuy, and his consent having been withdrawn, the continuation of the guardianship is unwarranted." The petition *to discharge* the guardian was in affirmation of the decree of appointment, averring that he had now become able to care for his property. The amendment was in *disaffirmance* of the original decree and denied its validity. At least in any other type of proceeding a party may not, in the same petition, both affirm and deny the validity of a decree.

When the guardianship was applied for, both DuPuy and his wife were friends of Arthur Scully, Esq., the trust officer of the Fidelity Trust Company of Pittsburgh, which handled their financial affairs. Because of DuPuy's conduct when he was suffering from hallucinations and delusions, and because of his throwing away his money when so affected, the trust officer suggested to both him and his wife that a guardian should be appointed. DuPuy recognized the advisability of this, and former Judge ELDER W. MARSHALL was called in to effectuate that result, and to represent

the guardian so appointed. DuPuy joined in the petition for the appointment. Evidence was taken and was generally to the effect that he threw away his money when on alcoholic debauches, and that he *had* become the victim of various designing persons. DuPuy himself was sworn as a witness and testified that he (1) was familiar with the proceeding; (2) had discussed it with his attorney; (3) was satisfied to have a guardian appointed to preserve his estate; and (4) wanted the Fidelity Trust Company made his guardian.

DuPuy well knew the evidence that could be produced as to his defective mentality. Mrs. DuPuy, the petitioner, did not call such evidence, since he stated in open court that he desired the guardianship. However, the testimony taken on the instant hearing undoubtedly showed that he was mentally defective at the time of the original appointment. Such evidence was not called in the initial proceedings because DuPuy did not want it.

In the present proceeding DuPuy did not deny that he was mentally defective at the time of the original appointment. But he did not claim that he consented because of any fraud, nor that he was mentally incompetent to consent; nor that he lacked understanding of the proceeding. As to the circumstances surrounding his consent and his request to the court, his testimony is silent. It is not necessary that mental defectiveness continue without a lucid interval, and during such lucid interval valid consent may be given. If he was mentally incompetent to consent to the original appointment, he certainly was then of defective mentality. If he was competent to consent, i. e., a lucid interval, he cannot attack the decree which he *asked* the court to make.

Actually, his position seems to be that he consented to the decree and requested the court to declare him

mentally defective, but that when the court complied with his request, this very decree retroactively invalidated and defeated his consent. With this we do not agree.

. The court had jurisdiction of the parties and the subject matter. For eight years DuPuy acquiesced in the decree. In the absence of any explanation of his consent and request, or any excuse therefor, he cannot now attack *the sufficiency of the evidence* to sustain the decree which he himself procured. If he petitioned the court to open the decree and permit him to produce evidence in denial of the petition, a different question might arise.

Order affirmed.