Sigel Estate.

Argued March 21, 1951. Before RHODES, P. J., HIRT, RENO, ROSS, ARNOLD and GUNTHER, JJ. (DITHRICH, J., absent).

T. Henry Walnut, for appellant.

C. Brewster Rhoads, with him Robert L. Trescher, for appellee.

OPINION BY RENO, J., July 19, 1951:

On the petition of her daughter and after a hearing at which appellant was not present, Emma Burk Sigel was found mentally defective in conformity with the Act of May 28, 1907, P. L. 292, as amended, 50 P.S. §941, et seq., and by a decree dated March 22, 1950, the Real Estate Trust Company, appellee, was appointed guardian of her estate. Later she petitioned the court below for a further hearing and for the discharge of the guardian. A further hearing was held in which she testified, and on November 20, 1950, the rule previously granted on her petition was discharged. From that order she appealed.

When the second hearing was held the time for taking an appeal from the decree of March 22, 1950, had expired (Act, supra, §8, 50 P.S. §964); the decree had become final; and the hearing judge properly ruled that the only question before the court was whether there had been such a change in appellant's mental condition as to warrant discharge of the guardian. On this appeal we cannot review the earlier determination, although the testimony taken at the first hearing furnishes data for the history of appellant's malady.

Appellant is 73 years old, and has been mentally disturbed over a considerable period. On August 4, 1941, she had been adjudged weak-minded and a guardian was appointed for her estate. On February 16,

1943, the court found that she had regained normality and the guardian was discharged. On March 1, 1950, appellant was committed to a mental health hospital[1] upon the affidavit of two physicians, and the following day her daughter instituted the proceedings upon which the first hearing was held. She was not brought into court on that occasion, and her own physician, Dr. Edward A. Strecker, who is described as a noted psychiatrist, testified: "Q. Could Mrs. Sigel, with safety to herself, be brought into court here today? A. No. It would have been dangerous. These delusions are very lurid and active inside herself. Had we brought her in here today a terrific mental explosion would have taken place within herself. After all, she is seventy one years old, and it might have a very bad effect on her heart and circulation." See Act, supra, §3, 50 P.S. §943. The psychiatrist also stated that he examined appellant in 1942 at which time she was well advanced in her mental illness and had delusions that neighbors were destroying her plants. He saw her again on February 9, 1950 when she had delusions that certain persons were using atomic rays to destroy her. She sought help from various sources, including the FBI, and devised elaborate precautions to insulate herself against these supposed rays. It was the doctor's opinion that "she could very readily become a victim of designing persons if some unscrupulous person would fall in with her ideas."[2]

---

[1] On September 20, 1950, appellant instituted a habeas corpus proceeding on which a hearing was held on October 5, 1950, at which appellant testified. At the date of the argument in this Court no decision had been rendered in the proceeding.

[2] Dr. Strecker, had testified in 1943 in favor of removing the guardian and it was then his opinion that she had sufficiently recovered to warrant such action, but he added: "I want, however, to make it clear that she is not entirely well."

The second hearing did not demonstrate a favorable change in her mental condition. To the contrary Dr. Strecker's testimony clearly indicated appellant's mental illness had progressed considerably since 1943 and would become worse. He testified: "She has a chronic paranoid psychosis which, in my opinion, is not recoverable, and she has had it for many years. Her condition between June of 1942 and her condition in 1950 showed the usual progress of this serious mental illness. Her delusions have increased apace, as I think was obvious here, and to such an extent that I reported that I had not within five years seen a patient who had such a tremendous delusional system." It was his very definite opinion that she was extremely likely to become the victim of designing persons.

In her own testimony appellant displayed knowledge of her property and investments and some information concerning the management of financial affairs. How exact her information was cannot be appraised, since there was no corroboration of her testimony. However, it should be said on her behalf that her testimony-in-chief, read in print, exhibited no mental disorder. But on cross-examination her delusions and suspicions became evident. She testified that there were many noises around the apartment, that she believed people were following her, that she was treated by Dr. Boyd, an osteopath, who told her that something electrical was coming through the walls, that black spots on her arms was caused by electricity coming through the walls, that she had metal sheets placed by the windows in the apartment to protect her against rays, and that Dr. Boyd suggested that she obtain a Geiger counter. She testified that she did not complain about rays coming through the windows, but later contradicted this by testifying that she had metal sheets placed against the windows to protect her

against the supposed rays. She admitted preparation of certain exhibits offered in evidence, which were illustrated rays being directed against her.

Appellant did not present any medical testimony in support of her petition. A prominent psychiatrist examined her, but his report is not in the record. The court below granted a further hearing for the purpose of taking his testimony but he was never produced.[3] Three cousins and two friends testified on her behalf. With one exception they were all familiar with her eccentric beliefs in electronic forces and that she had them for some years.

Appellant's chief contention is that, because her hallucinations have existed without dissipation of her estate, her ability to manage her own affairs without assistance has been demonstrated. But the very purpose of the Act is preventive and protective in nature. It was intended to operate prospectively in order to shield mental defectives against their own improvidence. Proof of specific instances that appellant in the past dissipated her property is not necessary. *Arthur's Case,* 136 Pa. Superior Ct. 261, 7 A. 2d 55. While the affidavits of the two physicians that Mrs. Sigel's mental condition warranted her admission to the hospital was not a legal determination, *Ryman's Case,* 139 Pa. Superior Ct. 212, 11 A. 2d 677, that fact plus the prior appointment of a guardian in 1941 adds weight to the soundness of the court's refusal to discharge appellee as guardian.

---

[3] ". . . where evidence which would properly be part of a case, is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to do so, the jury [or a trier of fact] may draw an inference that it would be unfavorable to him": *Hall v. Vanderpool,* 156 Pa. 152, 155, 26 A. 1069.

The mental condition of the person at the time of trial is always controlling. *Gorgas v. Saxman,* 216 Pa. 237, 65 A. 619. Appellant's mental state was then so affected by her delusions, which had rapidly progressed in the past few years, that she might readily be victimized by designing persons, and that condition justified the court's order. *DuPuy Estate,* 167 Pa. Superior Ct. 328, 74 A. 2d 804. The testimony overwhelmingly indicates Mrs. Sigel's need for a guardian to protect her interests, *Wingert Case,* 163 Pa. Superior Ct. 616, 63 A. 2d 441, and the court properly refused to lift the guardianship.

Order affirmed at the cost of appellant's estate.