## In Re Pearlman

*Joseph S. Lord, 3rd*, for petitioner.

*Marvin Comisky*, for guardian.

SPORKIN, J., March 23, 1960.—This matter comes before us on the petition of Justin Pearlman, herein called petitioner, praying that he be adjudged com-

petent and that his present guardian, Central-Penn National Bank,[1] be removed.

On May 27, 1953, after full hearing, we declared petitioner an incompetent and appointed Tradesmens National Bank & Trust Company of Philadelphia guardian of his estate.[2] Testimony taken before us at this hearing indicated that petitioner was suffering from paranoid schizophrenia.

On June 9, 1953, petitioner was committed to the Department of Mental and Nervous Diseases of the Pennsylvania Hospital in Philadelphia. Since then he has been confined at the following mental hospitals: Roseneath Farms, under the care of Dr. Herbert Freed; Fairmount Farm, under the care of Dr. George Wilson, and Friends' Hospital, under the care of Dr. Dane and Dr. Mansur. At various times during petitioner's confinement he was paroled, and on one occasion we adjudged him to be competent.[3]

Pursuant to section 323 of the Incompetents' Estates Act of February 28, 1956, P. L. (1955) 1154, 50 PS

---

[1] On May 25, 1959, Central-Penn National Bank was appointed guardian of Justin Pearlman's estate, replacing the original guardian. The substitution of guardian was directed by the court at the request of Provident Tradesmens Bank & Trust Company, successor to Tradesmens National Bank & Trust Company.

[2] The fair value of the estate at the time the guardian was appointed was $278,894.57. See inventory and appraisement filed September 25, 1953.

[3] On June 10, 1954, petitioner was paroled from Roseneath Farms; on April 12, 1955, he was adjudged competent; on September 19, 1955, he was again declared incompetent and ordered recommitted to Roseneath Farms; on January 15, 1957, he was paroled from confinement; on June 3, 1957, he was committed to Fairmount Farm, from which institution on June 9, 1957, he was transferred to Friends' Hospital, and thereafter on October 16, 1957, to Roseneath Farms; on November 17, 1958, he was paroled from Roseneath Farms and was permitted to live in a home maintained for him by his private nurse and her husband, where he now resides.

§3323, hearings were held on October 28, 1959, and December 17, 1959, on the instant petition. In the course of these hearings, Dr. Herbert Freed, of Roseneath Farms, and Dr. William R. O'Brien, Chief of Psychiatry at the Pennsylvania Hospital, testified to the effect that petitioner is "recovering" from a schizophrenic illness of the paranoid type; that he is not now suffering delusions, hallucinations or feelings of persecution, that he knows the nature and quality of his estate and that he is not likely to become the victim of designing persons.

The hearing on December 17, 1959, afforded the court another opportunity to observe petitioner on the witness stand. He appeared to have a clear understanding of the nature of his estate and of his surroundings. However, it must be noted petitioner's demeanor was much the same when he appeared before us on the previous petition to declare him competent and terminate the guardianship (March 31, 1955), which petition we granted.

On the latter occasion the court also had the benefit of testimony of Dr. Herbert Freed and Dr. Albert Biele, then Chief in Psychiatry at the Philadelphia General Hospital. Dr. Freed's testimony was strikingly similar to that which he offered at the hearing on October 28, 1959. At the March 31, 1955, hearing he stated: When he first saw petitioner in 1953 he was "quite psychotic"; petitioner suffered from "delusions" and "definite feelings" of mistreatment by members of his family; petitioner "has recovered from a mental illness of a serious nature, and he has full remission as far as being able to adjust socially"; petitioner "is not likely to become the victim of designing persons"; . . . in comparison to other times I have seen (petitioner), I would say that he has done quite well and now is what I would call rather well from this serious illness". At the same hearing, Dr. Biele testi-

fiel that petitioner was "restored to the highest state of mental health to which he is capable . . .".

Notwithstanding the opinions of these psychiatrists, within a few months after the termination of the guardianship, petitioner's mental health had so deteriorated that he again required confinement and treatment at Roseneath Farms.[4] Consequently, on September 19, 1955, we adjudged him incompetent and approved the commitment.

On January 15, 1957, petitioner appeared to be sufficiently recovered to permit his release from confinement, and he was again paroled. However, on June 3, 1957, the symptoms of his mental illness recurred and he was recommitted.

The record discloses that when this court either declared petitioner competent or paroled him from confinement, he exhibited outward indications of mental stability. Moreover, on each such occasion competent physicians (usually Dr. Freed) appeared and testified as to petitioner's recovery. However, following each occasion, with the exception of petitioner's parole on November 17, 1958, petitioner suffered a recurrence of mental illness necessitating reconfinement.

Medical or psychiatric testimony, phrased in the language of the statute, to the effect that an individual "is of sound mind and not likely to be the victim of designing persons", constitues an opinion. Of such conclusion, in view of our previous experience in this case, we must be wary. Similarly, we must give only

---

[4] Dr. Freed testified at a hearing held on September 8, 1955, as follows: "At that time [August 8, 1955] he was actually disturbed, markedly out of contact with reality. In other words, he was confused, paranoid, had ideas of persecution, didn't want to be overheard, talked about the possibility that . . . two families who lived near Roseneath might do something against him . . ., and in other ways acted in a manner to be considered distinctly psychotic."

tentative weight to the fact that petitioner demonstrates exterior stability. We must be especially cautious when the medical conclusion is coupled with guarded testimony that petitioner, whose case the psychiatrists had previously diagnosed as paranoid schizophrenia, is " recovering" from illness and that he is not "now" suffering delusions or hallucinations.

The medical experts testified that petitioner's present improved condition has been due to a prescribed therapy consisting of a "guarded environment", twice-daily dosages of stelazine and cogentin (tranquilizing drugs) and periodic psychiatric consultations. These experts shared the opinion that the abandonment by petitioner of any of these medical controls could cause a recurrence of mental incompetence.

On the basis of the present record we cannot, in good conscience, grant the prayer of the petition.

The Incompetents' Estates Act, 50 PS §3321(6), empowers a court to remove a guardian when, inter alia, "the incompetent of whose estate he is guardian is adjudged competent". Although the act does not define "competent" it does provide that an " 'incompetent' means a person who, because of mental infirmities . . . is unable to manage his property, or is liable to dissipate it or become the victim of designing persons": 50 PS §3102(3). See Refior Case, 160 Pa. Superior Ct. 305, 314 (1947).

The determination as to whether a person previously adjudged incompetent has become competent lies within the sound discretion of the court: Arthur's Case, 136 Pa. Superior Ct. 261 (1939). The burden of proof in such a case rests upon petitioner who must prove his competency by a fair preponderance of evidence: Earnshaw Appeal, 187 Pa. Superior Ct. 124, 127 (1958). Petitioner has not met this burden.

Considering the purposes of the statute, we cannot declare as competent one whose "soundness of mind"

depends upon the continued application of medical therapy and who faces the prospect of a relapse which might affect his capacity to handle his affairs, in the event that the treatment currently employed were to be discontinued. There is no basis in the record upon which we can make a determination that petitioner has fully recovered from his mental illness. Nor has there been demonstrated any substantial certainty that petitioner would not abandon the guarded environment, and the medical treatment and controls which are allegedly responsible for his presently improved condition, particularly since petitioner has refused to take prescribed oral medication in the past.[5] "(T)he very purpose of the [Incompetents' Estates] Act is *preventative* and *protective* in nature. It was intended to operate *prospectively* in order to shield mental defectives against their own improvidence": Sigel Estate, 169 Pa. Superior Ct. 425, 429 (1951). (Italics supplied.)

In this regard, the following excerpt from Dr. Earl D. Bond's report is particularly significant: [6] "(I)f in the future [the petitioner] is frustrated, or begins to believe he is frustrated, his history is likely to repeat itself. I see some hope that this man will become better balanced as he grows older but his future behavior is likely to follow the general pattern set in the past."

---

[5] Testimony of Dr. Freed at hearing March 14, 1956: "He is at present still psychotic. He is quite hostile. He talks irrationally on occasions. He recognizes me and he recognizes people around him, but he is very difficult to reason with. He refuses to take medication orally, and he obviously requires hospitalization which at the present time includes nursing care."

[6] This report of Dr. Earl D. Bond, psychiatrist and former physician-in-chief of the Institute of the Pennsylvania Hospital, was made on October 15, 1956, following examination of petitioner made at the request of the court, and was read into the record of the hearing on January 9, 1957.

Petitioner's testimony reveals that the guardian has provided amply for his needs. Therefore, we are convinced that no substantial inconvenience or harm is likely to accrue to petitioner if his estate continues to be protected by the court [7] until such time as testimony can be presented which will indicate a more complete recovery or a prognosis of mental stability not dependent on treatment or controls which may be temporary in effectiveness.

Accordingly, the petition to declare petitioner competent is denied, and the petition is dismissed.

[7] The most recent accounting filed on April 8, 1959, indicates that the value of the assets in the estate exceeds the value at the inception of the guardianship. The net balance as reflected therein, after administration expenses, and after substantial payments for medical, hospital and nursing care, was $281,003.23. See footnote 2, supra.