529 A.2d 466

**E. Newbold SMITH, Margaret Dupont Smith, Stockton N. Smith, Eleuthera S. Grassi and Henry B. Dupont Smith**

**v.**

**Lewis Dupont SMITH, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 12, 1987.

Filed July 21, 1987.

196

James B. Crummett, Philadelphia, for appellant.

Leonard Dubin, Philadelphia, for appellees.

Before CIRILLO, President Judge *, and BECK and HESTER, JJ.

HESTER, Judge:

This is an appeal by an adjudicated incompetent from a final order. The trial court found appellant to be incompetent due to mental illness, making him liable to dissipate his assets and become the victim of designing persons. The trial court appointed a financial institution as guardian of appellant's estate. We affirm.

On April 11, 1985, appellees, who are parents and siblings of appellant, filed an ex parte petition for a preliminary

---

* President Judge Cirillo replaced the deceased Justice Roberts.

injunction in the Orphans' Court Division of the Chester County Court of Common Pleas, requesting that appellant be restrained from transferring any of his substantial assets to organizations affiliated with Lyndon LaRouche. At the same time, appellees filed a petition requesting an adjudication of incompetency and the appointment of a guardian of the estate of the incompetent.

On November 12, 1985, following several evidentiary hearings, the trial court found that appellant, by reason of mental illness, was unable to manage his property or was liable to dissipate it or become the victim of designing persons. The trial court issued an adjudication and decree nisi finding appellant incompetent which became a final order on July 23, 1986, after the denial of appellant's exceptions.

Appellant raises six issues in this appeal: 1) whether appellees met their burden of proving by clear and convincing evidence that appellant suffered from a mental illness; 2) whether the trial court erred by labeling a "personality disorder" as a mental illness; 3) whether appellees met their burden of proving by clear and convincing evidence that appellant was liable to dissipate his property or become the victim of designing persons; 4) whether the trial court erred by including the support of a political philosophy or organization within the ambit of the phrase "become the victim of designing persons"; 5) whether the competency statute is constitutional as applied to appellant; and 6) whether the competency statute is constitutional on its face.

■ Appellant's constitutional issues must be considered first. We decline to address these issues as appellant did not give notice to the Attorney General of Pennsylvania as required by Pa.R.A.P. 521.[1] *Faust v. Messinger*, 345 Pa.Super. 155, 497 A.2d 1351 (1985).

1. **Rule 521. Notice to Attorney General of Challenge to Constitutionality of Statute**

   (a) **Notice.** It shall be the duty of a party who draws in question the constitutionality of any statute in any matter in an appellate court to which the Commonwealth or any officer thereof, acting in his official capacity, is not a party, upon the filing of the record, or as

Our scope of review in determining whether an individual should be adjudicated incompetent and have a guardian of his estate appointed is well established. The trial court has the sound discretion to determine whether the appointment of a guardian is necessary and this court will not reverse absent an abuse of that discretion. *In re Earnshaw,* 187 Pa.Super. 124, 144 A.2d 480 (1958). "We do not substitute our judgment for that of the court below; even though we, had we been sitting in judgment below, might have reached a contrary result." *Matter of Caine,* 490 Pa. 24, 29, 415 A.2d 13, 16 (1980) *quoting Myers Estate,* 395 Pa. 459, 462, 150 A.2d 525, 526 (1959).

■ A guardianship can be imposed if it is established that a person is, under 20 Pa.C.S. § 5501, "unable to manage his property, or is liable to dissipate it or become the victim of designing persons."[2] Additionally, it must be established that this "inability to manage one's property results from 'infirmities of old age, mental illness, mental deficiency or retardation, drug addiction or inebriety.'" *Matter of Caine, supra,* 490 Pa. at 28, 415 A.2d at 15 *quoting Porter Estate,* 463 Pa. 411, 415, 345 A.2d 171, 173 (1975). Finally, appellant's incompetence must be established by clear and convincing proof. *Matter of Caine, supra,* 490 Pa. at 28, 415 A.2d at 15.

soon thereafter as the question is raised in the appellate court, to give immediate notice in writing to the Attorney General of Pennsylvania of the existence of the question; together with a copy of the pleadings or other portion of the record raising the issue, and to file proof of service of such notice.

**(b) Status of Attorney General.** The Attorney General may be heard on the question of the constitutionality of the statute involved without formal intervention. If the Attorney General files a brief concerning the question the Commonwealth shall thereafter be deemed to be an intervening party in the matter.

**2. § 5501. Meaning of incompetent**
"Incompetent" means a person who, because of infirmities of old age, mental illness, mental deficiency or retardation, drug addiction or inebriety:
(1) is unable to manage his property, or is liable to dissipate it or become the victim of designing persons; or
(2) lacks sufficient capacity to make or communicate responsible decisions concerning his person.

■ Appellant argues that appellees failed to prove by clear and convincing evidence that he was suffering from a mental illness. The trial court found that appellant's personality began to change in early 1985; from "happy-go-lucky" to serious, withdrawn and hostile to his family. Trial court opinion, 11/12/85, at 1. Simultaneously, appellant became increasingly involved with the Lyndon La-Rouche organization.[3] Appellant loaned Caucus Distributions, Inc., an affiliate of the LaRouche organization, $212,-000 within two months.[4] This loan was evidenced by an unsecured promissory note for $142,000. Appellant testified that he would not be upset if the loan were not repaid and he was not certain that it would be. R. at 170a. Trial court opinion, 11/12/85, at 2.

Additionally, the trial court found that during the three years prior to this action, appellant incurred substantial losses as the result of ill-advised business investments.[5] Appellees' expert witness, a psychiatrist, who met with appellant and examined several of his writings, concluded that appellant was suffering from a schizoaffective disorder

3. Appellant suffered nightmares and became extremely withdrawn, "up tight" and nervous. He also began to espouse LaRouche philosophy even though he could not explain it. Reproduced record (hereinafter "R.") at 402a–04a.

4. Appellant's transfers to CDI:

| | |
|---|---:|
| February 13, 1985 | $ 6,000.00 |
| February 21, 1985 | 6,000.00 |
| March 5, 1985 | 25,000.00 |
| March 8, 1985 | 5,000.00 |
| March 20, 1985 | 100,000.00 |
| April 2, 1985 | 20,000.00 |
| April 4, 1985 | 50,000.00 |
| | $212,000.00 |

R. at 118a–24a.

5. Appellant invested $80,000 in the American Walnut Corporation in 1981 and lost the entire amount. R. at 174a. Appellant lost over $23,000 in silver bullion in May, 1981. R. at 175a, 223a. Over a two month period in March, 1984, appellant lost roughly $52,000 in various stocks. R. at 178a–79a.

and was likely to become the victim of designing persons.[6]
*Id.* at 2.

Moreover, appellant's expert witnesses, a psychiatrist and a psychologist, testified that appellant was suffering from a mixed personality disorder with inadequate and immature features.[7]  R. at 640a–41a, 807a.  Upon examination of appellant's letters and testimony, the trial court determined appellant has a "disorganized mind and compensates by setting up an oversimplified view of the world in which he is one of the good guys and 'they' are conspirators bent on mischief.  As such, he would be and has been an easy target for anyone who pretends to support him in his efforts to combat the bad guys."  Trial court opinion, 11/12/85, at 3.

The trial court was clearly convinced that appellant was "suffering from a 'mental illness' as that term is used in the legislation, so that he no longer has the ability to 'choose' in either a knowledgeable or totally voluntary way."  *Id.* at 7. Although the trial court heard conflicting evidence concerning appellant's mental condition, it found appellant "not equipped to deal with his financial affairs in even a minimal way, due to the disorganized and unrealistic way he views finances and world events.  He is a target for designing persons and is liable to dissipate his assets, and requires protection of the Court."  *Id.*  Upon thorough review of the record, we hold that the trial court acted within its sound discretion in finding that appellees proved appellant's mental illness by clear and convincing evidence.

6. Appellant suffers from a schizophrenic affective disorder which renders him unable to appreciate reality as to relate to it in any way other than in an "inappropriate and disfunctional fashion."  R. at 453a–7–453a–8.  Appellant suffers "delusions of persecution" and manifests symptoms of a "paranoid individual."  R. at 453a–10–453a–15.  Because of this mental illness, appellant cannot objectively judge those who say that they share his common ideology thus making it very easy for appellant to get swept up in his colleagues ideas that are of a financial nature.  R. at 453a–16.

7. Neither of appellant's expert witnesses believed that appellant suffered from a mental illness.  R. at 642a, 807a.

■ Appellant's next argument is that the trial court erred in labeling a personality disorder a mental illness. This argument ignores the trial court's finding that appellant is mentally ill as set forth in 20 Pa.C.S. § 5501. Trial court opinion, 11/12/85, at 7. Furthermore, this court has held:

> We are not unduly troubled by the question of semantics. The purpose of the Incompetents' Estates Act is preventative [sic] and protective in nature. *Card's Appeal*, 177 Pa.Super. 502, 110 A.2d 856 [1955]. The following language of President Judge Baldridge in *Refior's Case*, 160 Pa.Super. 305, 50 A.2d 523, 527 [1947], is particularly appropriate: "Whether an alleged incompetent is found to be mentally 'confused,' 'defective,' 'feeble,' or 'weak' is not vitally important. If, as here, it appears that one's mind is so affected that as a consequence thereof he is liable to dissipate or lose his property and become the victim of designing persons, the court, if other requirements are met, may appoint [or refuse to remove] a guardian".

*In re Earnshaw, supra,* 187 Pa.Super. at 129, 144 A.2d at 482–83.

The trial court properly found appellant's mind to be so affected that he was "suffering from a significant impairment in his ability to cope," thus making him liable to dissipate his assets and become the victim of designing persons. Trial court opinion, 11/12/85, at 7.

■ Appellant further argues that appellees did not meet their burden of proving by clear and convincing evidence that appellant was liable to dissipate his property or become the victim of designing persons. The trial court recognized that "a man may do what he pleases with his personal estate during his life. He may beggar himself and his family if he chooses to commit such an act of folly." *Bryden Estate*, 211 Pa. 633, 636, 61 A. 250, 251 (1905). Trial court opinion, 11/12/85, at 6. However, the court found by clear and convincing evidence that appellant was not able to choose in a voluntary or knowledgeable manner,

and in the event he dissipated his assets, he would not be doing so freely or voluntarily. Following an exhaustive review of the record, we agree.

■ Finally, appellant argues that the trial court erred by including the support of a political philosophy or organization within the ambit of the phrase "become the victim of designing persons." The trial court stated:

> It seems to us that the legislation is designed to protect one who has been peculiarly disabled by his or her mental makeup from resisting the exploitation of others. The evidence indicates that the exploitation has already begun, and that Lewis, because of his particular mental makeup, has succumbed to the blandishments of the LaRoach [sic] organization. The evidence further indicates that unless the Court intervenes, Lewis will continue to squander his admittedly substantial resources.

*Id.* We agree with the trial court that appellant's mental illness has resulted in producing a condition that has made him a victim of the LaRouche organization.

We affirm the order of the trial court adjudicating appellant incompetent and appointing a financial institution as guardian.

· BECK, J., filed a concurring opinion.

BECK, Judge, concurring:

I join the opinion of the majority. I write separately in order to emphasize that a finding of incompetency under the Decedents, Estates, and Fiduciaries Code must be based upon a searching inquiry into the facts of the particular case before the court.

As the Pennsylvania Supreme Court has noted, a law "which empowers a court to declare an individual mentally incompetent and to place such individual's business affairs in the hands of another is 'a dangerous statute easily capable of abuse . . .'" *Myers Estate*, 395 Pa. 459, 462, 150 A.2d 525, 526 (1959) (citing *Denner v. Beyer*, 352 Pa. 386, 388, 42 A.2d 747, 748 (1945)). *See generally* Comment,

*Guardianship Incompetency Standard,* 124 U.Pa.L.Rev. 1048 (1976). This danger of abuse is especially great where the alleged incompetent has given large sums of money to an organization which espouses a political ideology that is outside the mainstream. However, in the case *sub judice,* I find upon careful reflection sufficient evidence of record from which the trial court could have fairly concluded that appellant's incompetency was established and that the donations or loans he made to the LaRouche organization were manifestations of that incompetency. If appellant had given or lent money to the Republican or Democratic parties or to a recognized charity under the same circumstances as existed in this case, I would also have concluded that the trial court did not err in finding him incompetent. I therefore conclude that the incompetency statute was not applied in a discriminatory manner and that the trial court's order should be affirmed.

Appellant's own testimony reveals a certain confusion and apathy regarding his financial affairs. For example, at a hearing on April 16, 1985, he was unable to explain why he had transferred $50,000 to a group affiliated with Lyndon LaRouche on April 4, 1985, and he did not remember whether this transfer represented a gift or a loan. N.T. April 16, 1985 at 48–50. Appellant also had difficulty adding figures and he was unable to count backward by threes.[1] Appellee's expert witness diagnosed appellant as suffering in part from an organic mental disorder which impaired his ability to calculate. N.T. June 12, 1985 at 37; July 29, 1985 at 51–54.

The record also supports the inference that appellant has already become the victim of designing persons. Appellant's former roommate testified that during the fall of 1984, a representative of LaRouche often telephoned appel-

---

1. A. Backwards from a hundred by threes?
   Q. By threes.
   A. By threes. *Ninety-seven, 94, 80—87. Eighty-three, 79, 60—uhm, 69, 50*—how much longer do you want me to go?
   Q. All the way.
   A. Be here a long time.
   N.T. June 11, 1985 at 12.

lant two or three times a night to solicit money. N.T. June 12, 1985 at 5–6. At this time, appellant refused to make a donation; however, he became deeply involved in the La-Rouche organization in early 1985 after attending a series of lectures sponsored by the group. During this period, appellant told his brother that he was sleeping only two or three hours per night. N.T. June 11, 1985 at 83.

Between February 13, 1985 and April 4, 1985, appellant donated or loaned a total of $212,000 to the LaRouche organization. Although appellant assured his family that he would not give the organization any more money until he received his first interest payments on his loans, he changed his mind after visiting the group's headquarters in Leesburg, Virginia. N.T. April 20, 1985 at 13; June 11, 1985 at 199. On April 10, 1985, he attempted to wire an additional $75,000 to a LaRouche affiliate. It was at this point that his family filed a petition for the appointment of a guardian.

On June 11, 1985, appellant informed the trial court that he planned to move to Leesburg in order to work for the organization in return for what he described as a "nominal stipend." N.T. June 11, 1985 at 69. He also said that he was not interested in finding out how much he would be paid prior to relocating. *Id.* at 71. Later that month, he was told by his father's secretary that his mother had become severely depressed as a result of his actions; he reportedly responded, "[W]ell, someone had to be sacrificed for the cause and it might as well be her." N.T. August 30, 1985 at 44. Furthermore, in January 1986, six months before the trial court issued its final order, appellant was convicted in federal court of assaulting in an airport an individual who had questioned LaRouche's policies.

Finally, it is significant that even one of appellant's own expert witnesses testified that appellant has a "mental disorder" and that "He's more likely to be influenced, conned, if you will, than the average individual." N.T. July 9, 1985 at 75–76.

In light of all the circumstances of this case, the trial court did not abuse its discretion by concluding that there is

clear and convincing evidence that appellant suffers from a serious mental disturbance, that he is likely to dissipate his estate, and that he is not capable of making a knowing and voluntary decision to dissipate his estate because of his mental condition. Accordingly, I agree that the trial court acted properly when it appointed a guardian to manage appellant's assets.