## Ryman's Case.

Argued November 13, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Thomas M. Lewis,* with him *Henry Greenwald* and *Roland O. Brockway,* for appellant.

*C. W. Dickson,* with him *Benjamin R. Jones, Jr.* and *M. S. DePierro,* for appellee.

Opinion by Keller, P. J., March 2, 1940 :

On July 12, 1938 George Ryman, then seventy-seven years of age, was committed to the Danville State Hospital upon the affidavit of two physicians, under the Mental Health Act of July 11, 1923, P. L. 998, 50 PS §1 et seq. He was then a widower with eleven children living. His wife had died a few months before. He was the owner of two dairy farms, valued with the farm equipment, farm machinery, implements, cattle and livestock at $25,000, and had deposits in four banks aggregating $17,763.

Fifteen years before, he had been committed to the same hospital also on the affidavit of two physicians, but was released on probation after a period of five months, and a year later was "discharged as recovered," and had successfully attended to his business ever since. Two of his sons, Walter and Warren, assisted him in the operation of the dairy farms, each receiving one-fourth of the net income for his work.

On July 19, 1938, one of his daughters, Mrs. Caroline Ryman Hoch, brought this proceeding under the Act of May 28, 1907, P. L. 292, 50 PS §941 et seq., alleging that her father is so mentally defective that he is un-

able to take care of his property and in consequence thereof is liable to dissipate or lose the same and to become the victim of designing persons. In her petition she also averred that her father was insane, but her *prayer* was that the court should adjudge and declare him so mentally defective that he is unable to take care of his property, etc.—in the language of the statute as above recited—and appoint a guardian of his property. His insanity is relevant in this proceeding only so far as it bears on his incapacity to take care of his property. As respects all other matters, the proceedings to adjudge one insane must be taken under the Act of June 13, 1836, P. L. 589, and its amendments. See *Com. v. Reeves*, 140 Pa. 258, 21 A. 315. The Act of 1907, supra, and its predecessor, the Act of June 25, 1895, P. L. 300, as amended by Act of June 19, 1901, P. L. 574, deal only with persons whose mental condition is such that they are unable to take care of their property and in consequence thereof are liable to dissipate or lose the same and become the victim of designing persons, and not with other forms of insanity or mental weakness.

The respondent filed an answer denying the averments of the petition as respects his being insane or mentally defective, and demanded a trial by jury, and the dismissal of the petition.

An issue was accordingly framed, in which the petitioner was made plaintiff and the respondent, defendant, to determine: "Is George Ryman insane or feeble minded or so mentally deficient that he is unable to take care of his property and in consequence thereof liable to dissipate or lose the same and to become the victim of designing persons?" The adverb 'so', should have preceded the adjective 'insane' and 'feeble minded', as well as 'mentally deficient' or rather 'mentally defective'. As the case must be reversed, with a venire, for errors on the trial of the issue, before the case is retried the issue should be corrected accordingly.

It must be borne in mind also, that the framing of the issue was only to fix the question to be tried, and who had the burden of proof and the duty of going forward with evidence. It did not convert the proceeding into an ordinary cause of action at law. The point to be decided was the mental condition of George Ryman *at the time of trial,* with respect to his ability to take care of his property, and whether he is liable to dissipate or lose the same and become the victim of designing persons.

As the case must be reversed, we shall not go into the merits or recite the facts in evidence further than is necessary for the present disposition of the case.

(1) In the first place, both of the statutes providing for the guardianship of weakminded persons provide that, "Upon the day fixed for the hearing [or trial] the court shall *require* the presence [personal presence in court] of the person against whom the petition is presented, unless there is positive testimony to the effect that such person cannot be brought into court with safety to himself." (Italics supplied). This is deemed most important because the court, or jury, should have, if possible with safety to the respondent, the benefit of a personal view of his actions and conduct—and his testimony, if he desires to give it—on the hearing or at the trial. We do not regard the full testimony in court of Dr. Commarata as measuring up to the standard of 'positive' testimony required in the Act. What, if anything, further, the doctor may have informed the court in chambers, should have been produced, instead, in open court or, at least, at side bar, in the presence of counsel, and been subject to cross-examination. On the retrial, the *court* should *order* the respondent to be produced in court unless there is clear positive testimony that he cannot be brought into court with safety to himself. The duty rests on the *court* to *order* his presence at the trial.

(2) The court, perhaps throughout the trial and,

certainly, in the writing of his opinion, was misled by a slip of the tongue of Dr. Commarata, or an error of the stenographer in transcribing his testimony. On page 25a of the record, Dr. Commarata stated that Mr. Ryman "was first committed to the Danville State Hospital on the 20th day of July *1923* and remained under treatment until January 1, *1934,* a period of *five months and eleven days.* He was then placed on furlough for a year and during that year he made an adequate social and financial and economic adjustment and was discharged, from the records of the hospital, on January 2, 1935, as recovered." This was clearly an error as to January 1, 1934 and January 2, 1935, which should have been 1924 and 1925, respectively. The witness clearly so stated on pages 31a and 34a. Yet on page 345a, the court stated: "The history of his case shows that he has developed a mental illness which runs back three or four years. He first became an inmate of the Hospital in July, 1933, and on January 1, 1934, he was placed on furlough for a year; that during that period he made an adequate social, financial and economic adjustment and was discharged, according to the records, on January 2, 1935, as recovered." All of the matters referred to by the court occurred between 1923 and 1925, and a period of over *thirteen years and six months* elapsed between his prior discharge as recovered and his readmission to the hospital. On the retrial there should be no confusion on that score.

(3) The court also seems to have been of opinion that the act of two physicians in July 1923 and again in July 1938 in making affidavit that George Ryman's mental condition was such as to warrant his admission to the hospital was an *adjudication* or legal declaration or determination of his lunacy. It was not. It was only an ex parte affidavit, which justified the hospital in receiving him as a patient, if done in good faith, but it adjudicated nothing as to his lunacy. He could have

218

been ordered released at any time on habeas corpus, if the facts warranted it. The Act of June 13, 1836, supra, provides the method for a general adjudication of lunacy, and the Act of 1907 for such an adjudication as respects his incapacity to take care of his property. Affidavits of physicians under the Mental Health Act, supra, or its predecessor, Act of April 20, 1869, P. L. 78, without further action by a court, are not an *adjudication* of anything.

(4) This was not an action at law between two litigants. It was a proceeding to determine whether the respondent was so mentally defective that he was incapable of taking care of his property, etc. One's mental capacity is best determined by his spoken words, his acts and conduct. They are always relevant evidence for that purpose. The court was of opinion that much of the evidence offered on the respondent's behalf should be excluded because he was thereby making testimony for himself. He had a right to make all the testimony he could for himself. If he had been called as a witness in this proceeding he could have made testimony for himself, and those who came in contact with him at or near or after the time of his commitment to the hospital should have been permitted to tell of his conversation with them and his acts and conduct which tended to show that he was capable of taking care of his property and was not liable to dissipate or lose the same or to become the victim of designing persons; just as the petitioner, or plaintiff in the issue, had been permitted to bring witnesses who testified as to his conversation, acts and conduct which led them to think he was incapable of taking care of his property. His will, —changing the executors of a prior will, which was otherwise republished—prepared and signed on the *morning* of the day he was *later* committed to the hospital—not, as stated by the court, after he was in the hospital—should have been received in evidence along

with the testimony of those present when it was executed, as to the circumstances accompanying its execution and its agreement with or changes from, the prior will. A decree under the Act of 1907, supra, is prospective only (*Gorgas v. Saxman,* 216 Pa. 237, 239, 65 A. 619; *Arthur's Case,* 136 Pa. Superior Ct. 261, 264, 7 A. 2d 55). Such a decree does not, of itself, nullify a will signed the same day the proceedings were begun: *Taylor's Est.,* 316 Pa. 557, 559, 560, 175 A. 540; *Mulholland's Est.,* 217 Pa. 65, 68, 66 A. 150. See also *Olshefski's Est. (Gill's Appeal)* 337 Pa. 420, 11 A. 2d 487, filed February 1, 1940 (DREW, J.). The trust agreement, prepared under his direction and executed after this proceeding was begun, should likewise have been received in evidence, accompanied by testimony of those who were present when the agreement was authorized and executed etc.

The commitment to the hospital and institution of these proceedings did not operate as an injunction or cautionary court order restraining the respondent from preparing and signing business papers or agreements. Their validity was not in issue on this trial. They may be valid or invalid, as events turn out, but the respondent and his counsel violated no order of court or canon of professional ethics if, in good faith, they felt him capable of attending to business affairs and acted accordingly. The papers themselves might shed considerable light on the state of his mind at the time of their execution and his capacity to take care of his property.

The sole question is the mental condition of the person at the time of the trial: *Gorgas v. Saxman,* 216 Pa. 237, 239, 65 A. 619. Evidence of his recent conduct is circumstantial and is relevant because it throws some light on his present condition. In 1 Wigmore on Evidence (2d Ed.) sec. 228, p. 473, it is said:

"Sanity and insanity are terms applicable to the mode of operation of the mind as judged by some accepted standard of normality. The mode of operation of the

mind is ascertainable from the conduct of the person in question, i. e. from the effect produced by his surroundings on his mind when responding by action to those surroundings ...... On the one hand, no single act can be of itself decisive; while, on the other hand, any act whatever may be significant to some extent.

"The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue ......" (Cited with approval in *Com. v. Williams*, 307 Pa. 134, 143, 160 A. 602)

It is a fact often lost sight of, as it apparently was by the court below, that evidence relevant to an issue in the case and having probative value is usually admissible, and in order to be excluded, must be shown to come within a rule which makes it inadmissible. Professor Wigmore states it thus:

*"All facts having rational probative value are admissible, unless some specific rule forbids ......*

"This principle, then, does not mean that anything that has probative value is admissible; this would be an entire misconception. The true meaning is that everything having a probative value is 'ipso facto' entitled to be assumed to be admissible, and that therefore any rule of policy which may be valid to exclude it is a superadded and abnormal rule." (1 Wigmore on Evidence (2d Ed.) sec. 10, p. 152) Yet, whenever the question of admissibility of defendant's evidence arose, the court called on his counsel to produce authority for its admission. The usual reason given by the court for excluding it was that the evidence was self-serving. In Wigmore on Evidence (2d Ed.) sec. 1765, p. 768, it is said, "There is no principle of evidence especially excluding 'self-serving' statements by an accused or by

any one else." There was no 'cause of action' here to be affected by self-serving declarations. A very striking example of the admissibility of 'self-serving' acts and utterances is in criminal cases where the defense is insanity. In *Com. v. Williams,* 307 Pa. 134, 144, 160 A. 602, it is said:

"Evidence bearing on defendant's state of mind before, at, and after the commission of the crime, and showing a basis for insanity, is properly admissible on a plea of insanity. While such evidence usually consists of acts, yet statements to others indicating an unsound mind may be received. The hearsay rule forms no objection to the statements to third parties since they are received without reference to the truth of the statement, being merely indicative of a state of mind."

In 3 Wigmore on Evidence (2d Ed.), it is said:

"Sec. 1790. Utterances as Indicating Circumstantially the Speaker's Own State of Mind ...... The usual resort is to utterances which circumstantially indicate a specific state of mind causing them.

"To such a use, then, the Hearsay rule makes no opposition, because the utterance is not used for the sake of inducing belief in any assertion it may contain. The assertion, if in form there is one, is to be disregarded, and the indirect inference alone regarded. This discrimination, though well accepted in the law, is easy to be ignored, and it needs perhaps to be emphasized." (p. 822).

"Sec. 1766 ...... The prohibition of the Hearsay rule, then, *does not apply to all words or utterances merely as such* ...... The Hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely as *assertions to evidence the truth of the matter asserted."* (p. 771).

The court below followed this theory in admitting evidence that the defendant had said that his wife was unfaithful, that he was not the father of some of her

children, that they were trying to poison him, and so on. These alleged utterances were admitted not to prove that his wife had been unfaithful and so forth, but to show that his mind was unbalanced. By the same token, evidence tending to show that his actions, conversation, and business dealings were those of a normal, competent man, was admissible. See *Com. v. Spink,* 137 Pa. 255, 268, 20 A. 680.

Since the court did allow, on behalf of the defendant, testimony as to his actions and utterances before commitment to the hospital it is apparent that a controlling factor in excluding the evidence was his commitment. Speaking of the trust agreement, the court said, (283a) "It is an agreement made by a man *declared insane* and at the time in the insane hospital and it may be set aside." The statute under which the defendant was committed was the Mental Health Act of July 11, 1923, P. L. 998, and its amendments. As we have already said, this was not an adjudication of lunacy, as the act provides for the commitment to institutions of any person who is mentally ill or who would be benefited by or who needs such care as is required by persons mentally ill. Such commitment does not determine the mental status of the person committed, since it means merely that two physicians signed an affidavit that he was mentally ill *or* would be benefited by treatment.

It is clear then, that mere commitment to a mental hospital under the Act of 1923 above does not preclude the patient from testifying in cases generally, much less in his own behalf on proceedings to have him declared weak-minded. The statute of 1907 contemplates his presence in court and his testifying there. Nor does it render incompetent, in such proceedings, his acts and utterances while confined. Even if one has been adjudged a lunatic under the Act of June 13, 1836, P. L. 589 (50 PS §691 et seq.), he may later petition for restoration of his liberty and property on the ground

that he has been restored to sanity, under section 63, as amended by the Act of June 15, 1897, P. L. 162 (50 PS §891). Obviously, the only possible evidence which the petitioner could use in such a proceeding would be his own testimony on trial and testimony of others, as to his conduct and utterances *after the adjudication of insanity*. See In re *Smith*, 12 Pa. Superior Ct. 649, 656, where such evidence was used. Similarly, a patient committed as was the defendant here, may test the propriety of his detention by writ of habeas corpus: Act of July 11, 1923, P. L. 998, sec. 601(f) and (g) (50 PS §171); *Weightman's Est.*, 126 Pa. Superior Ct. 221, 222, 190 A. 552.

(5) We are also of opinion that the court below in its charge to the jury minimized too much the argument of counsel for respondent that the effect of a verdict in favor of the plaintiff in the issue would be to take respondent's property from him, and emphasized too much that its effect would be to protect his property for him. Of course, the purpose of the statute is to protect the property of a weak-minded person and prevent its loss or dissipation at the hands of designing persons. But if the respondent is actually capable of taking care of his property, the effect of a finding that he is weak-minded and of the order appointing a guardian is to take his property from him and put it into the custody of a guardian for him. Ownership of property carries with it the right of possession, control and disposition, and in so far as those rights are interfered with or abridged, the right of property is affected injuriously. Whether it is to his advantage or disadvantage depends on whether he is incapable or capable of taking care of his property, that is, whether he is mentally defective or not.

The statute of 1907 is a dangerous one, to be administered with great caution, because it is capable of abuse and may be used by one's relatives to take the custody and control of his property improperly away

from him: *Hoffman's Est.*, 209 Pa. 357, 359, 58 A. 665; *Bryden's Est.*, 211 Pa. 633, 636, 61 A. 250; In re *Anna C. Brinton*, 86 Pa. Superior Ct. 194, 198.

The first, third, fourth, fifth, sixth, seventh, eighth, twelfth, thirteenth, fourteenth, sixteenth, seventeenth and twentieth assignments of error are sustained. The decree is reversed and a new trial granted.