Feely Estate.

Argued March 24, 1953. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, GUNTHER and WRIGHT, JJ.

*Harry J. Alker, Jr.,* in propria persona, with him *Robert W. Morton* and *Edwin Hall, 2d,* for appellants.

*Laurence T. Himes,* with him *McLean Stock* and *Stock, Leader & Himes,* for appellees.

OPINION BY RHODES, P. J., July 14, 1953:

These two appeals are from the adjudication or decree of the court below allowing in part the respective

claims of appellants against the estate of a weak-minded person, as recommended in the report of a master.

On September 17, 1951, the Court of Common Pleas of York County entered a decree under the Act of May 28, 1907, P. L. 292, as amended, 50 PS §941 et seq. (now repealed), declaring Joseph A. Feely a weak-minded person unable to take care of his property, and appointing the York Trust Company, of York, Pennsylvania, guardian of his estate. The guardian subsequently filed an inventory and appraisement of the ward's property. Thereafter, on November 15, 1951, the guardian petitioned the court, setting forth the receipt of numerous claims and bills, principally from lawyers, physicians, and relatives, for services allegedly rendered the ward, and asking for the appointment of a master to hear and pass upon the validity of the various claims amounting to $8,169.62. The court on November 15, 1951, appointed a master. Later additional claims were presented totaling $10,743.33, including the claims of the appellant Harry J. Alker, Jr., Esq., for $2,063.33, and the appellant Dr. William W. Wilson in the amount of $3,150. At the time of the later hearings before the master, claims in the amount of $18,912.95 exceeded the then principal balance in the estate of $16,944.42.

The master held hearings at which claimants presented testimony as to the circumstances under which their services were rendered. He filed an extensive report in which he discussed in detail the evidence relating to the claims, made findings of fact, and recommended payments in the sum of $7,838.97. The master recommended that $520.50 of the claim of the appellant Harry J. Alker, Jr., Esq., be allowed, and that $950 of the claim of the appellant Dr. Wilson be paid. Upon exceptions filed to the master's report the Court of Common Pleas of York County, after argument, en-

tered a decree accepting the findings and conclusions of the master, and adjudicating the claims of the appellants Alker and Wilson in the amounts recommended by the master. It is from this decree that the present appeals to this Court have been taken.

It is not necessary to review the voluminous record in detail. But a summary of the salient facts as found in the master's report and as they appear in the evidence is requisite to a disposition of the questions raised by the appeals. On April 24, 1951, Joseph A. Feely, a widower, aged 72 years, lived alone at the Yorktowne Hotel, York, Pennsylvania. Feely, formerly an employe of the Atlantic Refining Company, received a pension of $437.42 per month from Atlantic, and a salary of $17,000 per year from Keystone Roofing Manufacturing Company of which he was an officer and principal stockholder. His closest relatives were a brother, John F. Feely, a sister, Irene M. Wright, and a nephew, Jerome F. Feely, all residing in the State of New York. A stepdaughter, Mildred F. Hart, is also a resident of that State. A foster son, Stephen A. Feely, also known as Stephen Bolacci, lived in York, Pennsylvania. Neither the stepdaughter nor the foster son had been adopted.

On April 24, 1951, Stephen A. Feely, the foster son, was summoned to Yorktowne Hotel to look after Feely who was ill. Mrs. Hart, the stepdaughter, was also called and came to York. A physician who examined Feely at this time found him intoxicated or under the influence of narcotics, and recommended his removal to an institution. Feely remained, however, at the Yorktowne Hotel under the care of physicians and nurses employed by Mrs. Hart. Dr. H. P. Belknap was secured by Mrs. Hart, and he attended Feely from May 1, 1951, to June 26, 1951. As of May 28, 1951, this physician stated Feely was not mentally able to evalu-

ate his medical needs. On or about June 14, 1951, Feely's brother, John F. Feely, and sister, Irene M. Wright, were called to York, where they retained counsel. At this time Stephen A. Feely and Mrs. Hart were represented by other counsel. The parties and their counsel conferred frequently thereafter concerning Feely and his estate. On June 20, 1951, at the suggestion of Dr. Belknap, three psychiatrists examined Feely in York, and they all agreed that he was mentally incompetent and not capable of handling his own business affairs, and that he needed institutional care. The foster son alone opposed placing him in an institution.

Dr. Belknap suggested several institutions to which Feely might be admitted. The parties later agreed upon Fairmount Farms, near Philadelphia, of which the appellant Dr. Wilson is the medical director and a stockholder of the corporation operating this institution. Dr. Belknap made the arrangements with Dr. Wilson, and on June 26, 1951, Feely was admitted to Fairmount Farms as mentally incompetent, and remained there until December 22, 1951. Expenses of maintenance at Fairmount Farms were paid in due course and are not involved in these appeals. After entry of the decree declaring Feely incompetent and appointing the guardian the court authorized expenditures not to exceed $1,200 per month for the maintenance of the ward.

About June 29, 1951, Dr. Wilson called Harry J. Alker, Jr., Esq., whom he knew, and asked him to come to Fairmount Farms to interview Joseph A. Feely who desired to make a will. Mr. Alker met Feely, interviewed him and discussed with him the terms of a will. Both Mr. Alker and Dr. Wilson suggested that he be examined by two independent mental specialists who would certify to his testamentary capacity. At this time Mr. Alker also discussed with Feely the adoption

of Mrs. Hart and Stephen A. Feely in order to reduce inheritance taxes. After examination by the two specialists obtained by Dr. Wilson, who certified to his mental competency and acted as witnesses, Feely, on July 3, 1951, executed the will drawn by Mr. Alker. At the same time Mr. Alker, apparently at his own instance, prepared and had Feely sign a general power of attorney from Feely to Stephen A. Feely, the foster son, and Mildred F. Hart, the stepdaughter. The will and power of attorney have apparently been retained by Mr. Alker. Arthur Markowitz, Esq., of York, also interviewed Feely on July 4, 1951, at Fairmount Farms, and informed him of pending guardianship proceedings in York County which Feely desired to resist. At this time Feely also discussed the adoption of Stephen A. Feely with Mr. Markowitz and asked the latter to proceed with the adoption. Mr. Markowitz prepared a petition which was later abandoned.

On July 6th and 10th, 1951, respectively, Mr. Alker filed petitions for adoption by Feely of Stephen A. Feely and Mrs. Hart in the Municipal Court of Philadelphia County. On July 18, 1951, counsel filed a petition in the Court of Common Pleas of York County on behalf of Feely's brother and sister seeking the appointment of a guardian of the estate of Joseph A. Feely. Local counsel retained Philadelphia counsel who attempted to serve notice of the guardianship proceedings on Feely at Fairmount Farms, but were prevented from doing so by Dr. Wilson and Mr. Alker. Mr. Alker arranged to have Feely live at a Philadelphia hotel during the adoption hearings. Mr. Alker further arranged for Dr. Wilson and the two specialists they had obtained to examine Feely to be present at the adoption hearings in the Municipal Court of Philadelphia County on July 25, 1951, to testify that, in their opinion, Feely was competent to proceed with

the adoptions. These three physicians, Joseph A. Feely, Mr. Alker, Mrs. Hart, Arthur Markowitz, Esq., Feely's sister and brother, and their counsel were present in the Municipal Court for the adoption hearings on July 25, 1951. Also in attendance were Doctors Belknap and O'Brien who were prepared to testify that Feely was not competent to proceed with the adoptions. After discussion, the parties and their counsel were unable to reach any agreement, and the adoption proceedings were subsequently abandoned.

Meanwhile, efforts were continued to procure an adjudication of incompetency and the appointment of a guardian for the estate of Joseph A. Feely in the Court of Common Pleas of York County. Notice of this petition for the appointment of a guardian was finally served on Feely on July 26, 1951. Thereafter Feely, through various attorneys, first filed an answer denying incompetency and demanding a jury trial, and then a power of attorney admitting incompetency which was subsequently withdrawn. The Court of Common Pleas of York County appointed Dr. Milton Cohn to examine Feely at Fairmount Farms, and the doctor found that he was mentally incompetent. Finally, on September 17, 1951, the Court of Common Pleas of York County, at a continued hearing on the petition, adjudged Joseph A. Feely a weak-minded person unable to take care of his property, and appointed the York Trust Company guardian of his estate.

On December 21, 1951, Mrs. Hart sought, and the Court of Common Pleas of Philadelphia County allowed, a writ of habeas corpus directing Dr. Wilson to produce the ward before the court on the ground that the ward was unjustly detained. In this proceeding Philadelphia counsel represented Mrs. Hart and Mr. Alker represented Dr. Wilson. After a preliminary hearing, the habeas corpus proceeding was discontinued,

and Dr. Wilson agreed that the ward be placed in Mrs. Hart's custody until December 26, 1951. Subsequently, it appeared that the ward had fallen and suffered a broken hip, and was confined indefinitely in a general hospital in Philadelphia.

We are not concerned with claims of various attorneys, physicians, and relatives for services rendered and moneys allegedly expended on behalf of the ward. The only claimants to appeal are Harry J. Alker, Jr., Esq., and Dr. William W. Wilson.

As stated, the total claim of Dr. Wilson was $3,150, of which the master recommended the allowance of $950. Dr. Wilson claimed $200 for the will consultation of July 1, 1951, which, after reviewing all the evidence, the master found should be disallowed on the ground that the ward's estate was not liable for such services either on a contractual or any other basis. The master likewise recommended the disallowance of Dr. Wilson's claims of $200 for answering the writ of habeas corpus and for attending a hearing on the writ. On the claim of $250 for court appearance in the adoption proceedings instituted by Mr. Alker, the master recommended the payment to Dr. Wilson of $100, and, in a similar claim of $500 for a court appearance in York in the guardianship matter, the master recommended the payment of $200. Dr. Wilson alleged that there was an express contract to pay him $250 per month for services as the ward's personal physician while at Fairmount Farms from June 26, 1951, to December 28, 1951, or a total of $2,000. The master found, on conflicting evidence, that no such contract existed, but recommended the allowance to Dr. Wilson of $650 for the reason that that amount was proper for the services rendered the ward as necessaries. The court found from the testimony, as did the master, that Dr. Wilson

was entitled to the sum of $950, and the payment of his claim to that extent was allowed.

The master and the court below disposed of the claim of Mr. Alker totaling $2,063.33 along similar lines. After reviewing the evidence, the master found that there was no enforcible contract between the ward or his representatives and Mr. Alker to pay for the latter's services in drawing a will, in preparing a power of attorney, and in initiating the adoption proceedings. The master also found as a fact that these services of Mr. Alker to the ward were not necessaries, under the circumstances disclosed by the evidence, for which recovery could be had on that basis. The master allowed Mr. Alker the sum of $520.50, being payments which Mr. Alker made for hire of nurses and for advancements on behalf of the ward which were within the category of necessaries.

Under the Act of May 28, 1907, P. L. 292, §6, 50 PS §961, the guardian of a weak-minded person had the same duties and powers as a committee on lunacy. *Gerlach's Estate,* 127 Pa. Superior Ct. 293, 300, 193 A. 467. And it has been held that the incompetent was in effect the ward of the court, and after adjudication of incompetency the ward's estate was in custodia legis. *Barclay-Westmoreland Trust Co. v. Dollar Savings Bank,* 338 Pa. 421, 425, 12 A. 2d 586. Appellants claim the master and the court below had no authority, as a matter of law, to set aside contracts of the incompetent for legal and medical services, where such contracts were entered into prior to the adjudication of incompetency. Contracts made by an incompetent prior to the adjudication of incompetency are voidable upon a proper showing that the party was in fact incompetent at the time of the contract. *Crawford v. Scovell,* 94 Pa. 48; *Bush v. Breinig,* 113 Pa. 310, 6 A. 86; 28 Am. Jur., §56, p. 692. See *Rubins v. Hamnett,*

294 Pa. 295, 144 A. 72; *Youngwood Building & Loan Ass'n v. Henry*, 137 Pa. Superior Ct. 124, 126, 8 A. 2d 427. Evidence of transactions by the alleged incompetent shortly before and after the transaction in question is admissible to show the alleged incompetent's condition at that time. *Rubins v. Hamnett*, supra, 294 Pa. 295, 299, 144 A. 72; *Mulholland v. Sterling Motor Truck Co.*, 309 Pa. 590, 592, 164 A. 597.

An incompetent is liable for necessaries furnished to him prior to the adjudication of incompetency. *La Rue v. Gilkyson*, 4 Pa. 375; *Weightman's Estate*, 126 Pa. Superior Ct. 221, 190 A. 552. "It is, of course, essential to show that the legal services rendered were reasonably necessary for the welfare of the incompetent, before a recovery therefor on the theory that they are necessaries will be allowed": 28 Am. Jur., §64, p. 700. It is true that the Act of May 28, 1907, P. L. 292, was intended to operate prospectively only (*Ryman's Case*, 139 Pa. Superior Ct. 212, 219, 11 A. 2d 677; *Owens Appeal*, 167 Pa. Superior Ct. 10, 12, 74 A. 2d 705), and that a decree of incompetency did not ipso facto affect previous transactions. After an adjudication of incompetency by the court all transactions with the incompetent are presumptively invalid. *Pennsylvania Company for Banking & Trusts v. Philadelphia Title Insurance Co.*, 372 Pa. 259, 262, 263, 93 A. 2d 687. But where, as here, a claim is made against the estate of an incompetent in the hands of the guardian for professional services allegedly rendered the ward, the court clearly has authority to pass upon and adjudicate the validity of the claim, in accordance with established principles of law relating to contracts with incompetents, even though the claim is based on transactions occurring prior to the decree of incompetency. Cf. *Rubins v. Hamnett*, supra, 294 Pa. 295, 144 A. 72; *Pryor's Estate*, 150 Pa. Superior Ct. 75, 27 A. 2d 466,

The estate is in custodia legis and a claim to be paid therefrom must be properly established.

The claims presented against the ward's estate were to be disposed of upon their individual merits and in the exercise of a sound judicial discretion controlled by their particular circumstances. *Weightman's Estate,* supra, 126 Pa. Superior Ct. 221, 228, 190 A. 552. Otherwise, the estate of the ward might be entirely dissipated by the many claims arising out of alleged transactions with him. Moreover, charges against the estate of a weak-minded person must be manifestly just and moderate. *Pryor's Estate,* supra, 150 Pa. Superior Ct. 75, 27 A. 2d 466.

It was found as a fact that the services rendered by the appellants, as to which payment was disallowed, were not sustainable on a contractual basis; that such services were not beneficial to the ward; and that they were not reasonable and just charges such as would justify recovery under the theory of necessaries furnished the ward. The validity of appellants' claims against the estate of the ward and the extent to which they should be allowed were essentially factual matters to be decided on the voluminous and conflicting evidence presented. The findings of the master, adopted by the court, were amply supported by evidence, and are binding on appeal in the same manner as is the verdict of a jury. *Mulholland v. Sterling Motor Truck Co.,* supra, 309 Pa. 590, 164 A. 597; *Pryor's Estate,* supra, 150 Pa. Superior Ct. 75, 78, 27 A. 2d 466.

It is unnecessary for us to make a comparative review of the evidence in this respect or to comment further on the circumstances under which appellants' claims arose. The evidence in the record is sufficient to establish the ward's mental incompetency before his commitment to Fairmount Farms and while there, prior to the decree of September 17, 1951, in the guard-

ianship proceeding. The evidence being sufficient to support the adjudication of appellants' claims, it is therefore immaterial whether the evidence would also support a finding allowing in full the claim of either or both appellants against the ward's estate. The substantive law governing the liability of the estate of the ward for the services allegedly rendered has been correctly applied by the court below.

The proceedings for the appointment of a guardian for the estate of the ward were instituted before the effective date of the Incompetents' Estates Act of June 28, 1951, P. L. 612, 50 PS §1631 et seq., which became effective January 1, 1952, and which repealed the Act of May 28, 1907, P. L. 292. The court below appointed a master to hear and pass upon the various claims against the ward's estate prior to the filing of a formal account by the guardian. All parties acquiesced in the procedure. Neither the authority of the court to appoint a master to hear and determine the claims nor the master's authority to so act for the court has been questioned. The disposition of the claims under the procedure adopted by the court and in which all parties acquiesced was effective. Without passing upon the propriety of the procedure adopted we are not disposed to disturb the results on appeal. The substance of the claims was fairly adjudicated and the proceeding should be concluded on the merits rather than remitted on technical or procedural grounds. There is no allegation by appellants that procedural due process was lacking.

Each appeal is dismissed at the cost of the appellant therein.