## Axe Estate

*D. Donald Jamieson,* for petitioner.

*Lawrence J. Richette,* for respondent.

SHOYER, J., February 3, 1964.—This is a proceeding under the Act of 1955, enacted February 28, 1956, P. L. [1955] 1154, as reenacted and amended by the Act of July 11, 1957, P. L. 794, known as the Incompetents' Estates Act of 1955. Pursuant to the statutory provisions, Lillian Axe Sporkin filed her petition with this court to have her father, Burney Axe, declared an incompetent and a guardian of his estate appointed, alleging that "because of mental infirmities of old age and mental deficiency [he] is unable to manage his property and is liable to dissipate it or become the victim of designing persons." The respondent is approximately 92 years of age and a widower, his wife having died on December 10, 1962. By her he had five children, three sons and two daughters. While Burney Axe alone is named as the respondent, this proceeding is actually an attempt by Lillian, who is married to a lawyer, Harry D. Sporkin, Esq., to make certain that her father will divide his estate equally among his five children and not favor her brothers. This intention is admitted by Lillian's counsel in his brief and is substantiated by the litigation that has ensued since respondent became a widower. Thus, within a month or two after his wife's death, a habeas corpus petition was filed in the County Court of Philadelphia under no. 233951, with both daughters as relators, charging that Burton Axe and Lester Axe, two of the sons, were

preventing their sisters from seeing their father and keeping him virtually a prisoner. Following a hearing before Judge DiNubile on February 13, 1963, at which Burney Axe testified that he loved all his children equally and would make his own decision as to where he wished to live, the matter was continued generally.

The evidence before this court shows that Mr. Axe bought premises 737 W. Allens Lane, Philadelphia, as a home for his wife, himself and such children as were then living at home. Burton and Milton live on each side of this home; one in a house which the father bought for him, the other in a home which his father caused to be built at a cost of $26,000 to $28,000. In the rear of the mansion house is a cottage and garage where Lillian and her husband live. Respondent spent $40,000 to $50,000 to renovate this building as a home for Lillian at her request as a marriage present. Milton, the third son, lives in New York. In September 1963, shortly before commencement of the instant proceedings, Mrs. Sporkin, without the approval of her father, filed a petition for letters of administration on the estate of respondent's wife, Jennie Axe. Subsequently, on October 2, 1963, a hearing on the petition for letters of administration was had before the Register of Wills of Philadelphia. That matter remains undecided and no further steps have been taken to push it. The hearing judge is informed that additional litigation is pending between the brothers and sisters in both Philadelphia and New Jersey.

The Act of 1955, like its predecessors, has been characterized as a dangerous statute easily capable of abuse. Thus in Myers Estate, 395 Pa. 459, 462, our Supreme Court said:

"In reviewing the propriety of the action of the court below, we must bear in mind that this statute—as every other statute of like nature—which empowers a court to declare an individual mentally incompetent

and to place such individual's business affairs in the hands of another for management and care is 'a dangerous statute easily capable of abuse . . .': Hoffman's Estate, 209 Pa. 357, 359, 58 A. 665; Bryden's Estate, 211 Pa. 633, 636, 61 A. 250; Denner v. Beyer, 352 Pa. 386, 388, 42 A. 2d 747; Ryman's Case, 139 Pa. Superior Ct. 212, 223, 11 A. 2d 677; Owens Appeal, 167 Pa. Superior Ct. 10, 12, 74 A. 2d 705; Nagy Appeal, 169 Pa. Superior Ct. 388, 390, 82 A. 2d 591. Mental capacity and competency are to be presumed and before any person shall be deprived of the right to handle his or her own property and manage his or her affairs there must be *clear* and *convincing* proof of mental incompetency and such proof must be *preponderating*: [citing cases]."

The truth of this characterization of these statutes by our appellate courts is evidenced by the numerous instances where children have brought proceedings against an elderly surviving parent in order to compel distribution of the latter's property in accordance with the Intestate Laws rather than the desires of the parent. Starting with Bryden's Estate, 211 Pa. 633, in 1905, there followed In re Brinton, 86 Pa. Superior Ct. 194, Owens Appeal, 167 Pa. Superior Ct. 10, and Nagy Appeal, 169 Pa. Superior Ct. 388, which are all instances of this sort. In Denner v. Beyer, 352 Pa. 386, 388, a proceeding brought by a sister against respondent who had been recently widowed, our Supreme Court said: "The record gives the impression that the motive for the petition was not so much to conserve the respondent's property as to channel its inheritance to the next of kin."

The essence of a proceeding under the Act of 1955 is the mental competency of the respondent at the time of the hearing. The litigation is not an action at law: Ryman's Case, 139 Pa. Superior Ct. 212, 218, yet counsel in the stress and heat of the underlying contest

of sisters against brothers have lost sight of this fact. Counsel for respondent, rather than enter into a full hearing after petitioner rested, moved to dismiss the petition on the ground that petitioner had failed to prove a prima facie case, and this despite the fact that the testimony of respondent had been taken early in the proceeding in the judge's chambers in the presence of both counsel and the court reporter, other persons being excluded. This, of course, raised the issue of whether respondent was testifying as a witness for either side, or should be considered by the court as in some other category. Counsel for petitioner quickly followed this motion to dismiss by request for leave of court to withdraw his petition and discontinue the proceeding.

It should be noted that prior to the first hearing, which was held on October 17, 1963, respondent was examined by Dr. Harry W. Cohen, a qualified psychiatrist, by agreement of counsel entered into at a conference in chambers. Dr. Cohen's name was suggested by the court because he has appeared as an expert witness on many occasions and testified in cases in which the Veterans Administration was concerned. Dr. Cohen is well experienced and thoroughly qualified to determine mental competency. He is also a lucid and convincing witness. The examination by Dr. Cohen was in in the nature of a reference to an impartial medical examiner. A formal rule providing for the appointment of impartial medical examiners was then under consideration by this court although not formally adopted until November 22, 1963. It was contemplated that Dr. Cohen would appear to testify at the hearing. To save expense, respondent's counsel did not call him. Written copies of his report were forwarded to the court and to counsel under date of October 15, 1963, but both counsel closed their cases without formal introduction of the report. From failure of petitioner's counsel to

introduce the report (or, indeed, any medical evidence), the hearing judge is warranted in inferring that he considered the report as unfavorable to petitioner's case: Hall v. Vanderpool, 156 Pa. 152, 155; Sigel Estate, 169 Pa. Superior Ct. 425, 429. Following Lillian's request to discontinue, the hearing judge made the report a part of the record and waived the calling of Dr. Cohen as a witness. Dr. Cohen's written opinion concludes that Burney Axe is mentally competent to manage his own affairs.

In passing on the effect of counsel's formal motions, the court must not lose sight of the fact that regardless of the subsurface contest being waged by respondent's next of kin, the act under which this proceeding was brought is primarily a protective one and the welfare of the respondent is paramount: Sigel Estate, supra, p. 429. As our Supreme Court has recently said in Myers Estate, 395 Pa. 459, 467, "By far the most significant evidence of record is [respondent's] own testimony." In the light of this expression by our Supreme Court it becomes impossible for the hearing judge to adjudicate the present controversy without taking into consideration the testimony of respondent.

Burney Axe testified in chambers for approximately 1 hour and 10 minutes. His physical condition is such that he walks with a cane, his vision is slightly impaired and he is quite hard of hearing. He is very well groomed and is immaculately clean. He was dressed in a handsome dark suit which was obviously custom-tailored of expensive material. His bearing is dignified. The description, "gentleman of the old school," fits him perfectly.

Lillian's counsel produced a list of 99 questions which the hearing judge used as a basis for interrogation. Not all the questions were asked, but Lillian's counsel expressed his satisfaction with the court's examination of the respondent.

When asked if he loved all his children alike, Burney Axe responded, "Well, I got to do more for one sometimes than for another. I do according to what they need . . . My sons are helping me, because they look after me." He testified as to the many gifts which he has given his children. In addition to the homes referred to above he said that he had given Lillian jewelry worth $100,000 [she admits this in paragraph 6 of her reply to new matter] and that he would provide a home for Hilda should she get married. He testified "But I would keep her in mind that she is the only one that has to be thought of . . . I take care of all my children." When asked, "Have you given any large sums of money to your sons during the last five years?" Burney Axe answered, "Oh, goodness, plenty. I left my business. I don't remember exactly whether I had sixty or seventy thousand dollars laying in bank, and I didn't owe a dollar to anybody for merchandise, and my merchandise, maybe $100,000. I turned it over. They want to pay me a salary. I said, 'I don't need it.' I gave it to the three boys. The girls, I didn't have to, because I gave them—they were both home at the time, they were both single. The day Lillian got married I gave her what she wanted. I gave her cash, I gave her —I bought her anything she wanted. She said she wants a home. I said, 'All right, I'll fix it up; where do you want it?' She said, 'I'll take the cottage; you fix it over.' I spent, I don't know, maybe forty, fifty thousand dollars to make it the way she wanted, and I handed it over to her. It was in her name anyhow." He stated that he had no disagreements with any of his children, and when asked if he was afraid of any of them he answered, "I'm not afraid of any of them, only what they think of me. My girls don't bother with me; only when I have money and will I give it to them. My boys, they are more decent."

He gives Hilda $40 cash every week. When asked if Hilda were in good health, he replied that nothing is the matter with her. This answer is not completely accurate because Hilda is a sufferer from cerebral palsy. Fortunately the affliction is evidently not too severe because she is able to walk in normal fashion. She was a witness for her sister, her testimony being taken in chambers to relieve the nervous strain. The stress of being a witness increased her speech difficulty and resulted in exaggerated and somewhat uncontrolled movements of her head, mouth and neck, which were not evident while she was seated in the courtroom as a spectator. Respondent's optimistic appraisal of Hilda's health may be excused him as a loving parent. During the course of the hearing he took steps to provide for her by a trust fund of $55,000, title to real estate worth $10,000 and a change of beneficiary in a $10,000 life insurance policy.

Because Hilda sleeps until one o'clock is the reason that Burney Axe prefers to live with one of his sons. He believes that any girl should get along on the $40 a week which he gives her and, in addition, she gets more. He pays for her gas bill, electric bill, for everything.

Respondent showed no lack of memory as to the making of his will. Since his testimony, when taken as a whole, showed *not the slightest impairment* of his mental competency, it would have been a violation of his right of privacy for the hearing judge to have insisted upon the unrestricted publication of the document prepared by Mr. Rattin. It was submitted for identification, marked by the court reporter, and its authenticity can be readily established if questioned in some future will contest. Since the eventuality of such contest seems certain, the tape recording made by the reporter of Burney Axe's testimony will be preserved and impounded until needed.

Respondent testified that he gave $20,000 to Harry Sporkin, his son-in-law, which he never got back although Harry promised to repay him. He does not feel that he has to help his son-in-law as he does his sons whom he is duty bound to help, "[b]ut a son-in-law, let him work like I did. I worked hard in my day to make my money. I had nothing. I come from the old country, and I had nothing."

When questioned about his property, Burney Axe said he takes care of it, does as he thinks best without having to consult with anyone, and tries to get all the rent he can. He told about boosting the rent on his Wildwood property from $13,000 to $15,000 a year on a three-year lease. He produced the written lease from his pocket and showed it to the hearing judge. He identified the signatures of the parties. His recollection and recital of the contents of the lease were quite accurate.

At the court's request, as a test, he signed his name at the bottom of a blank sheet of 8½″ x 11″ paper, and when the court suggested to him that it might be made into a promissory note to pay the Judge $50,000, he answered "I don't owe it to you. I wouldn't want to pay it. I know you are an honorable man. I am not afraid to sign anything for you." Compare, for the sake of proper evaluation, the testing by a son in In re Brinton, 86 Pa. Superior Ct. 194, 196, which test was held to be no evidence whatsoever of any weakness of mind. The placing of trust where confidence is warranted is, of course, no proof of failing mental faculties.

In appraising the testimony of Burney Axe, it is certain that he was not only oriented thoroughly as to time, place and person, but there was very little impairment, if any, in his memory. He kept track of the time, noting in the course of his testimony that it was about 11:30 and that he usually ate his lunch at noon-

time. He was able to rationalize as he answered questions and gave valid reasons for giving his sons more help than his daughters. He exhibited strength of mind and ability to make decisions and to adhere to them. There was no evidence of vacillation. His power of volition was unimpaired. A careful reading of his testimony should convince anyone that it bears the impress of intelligence, alertness and capacity.

Burney Axe has an undoubted right to prefer his sons over his daughters, even if this preference were to rest upon unfounded prejudices, which obviously it does not: Owens Appeal, 167 Pa. Superior Ct. 10, 18.

It would lengthen this opinion unduly to comment on the testimony of all the witnesses. The sale of the $100,000 in treasury bonds and receipt of the proceeds in cash was unusual, but there is no proof that Burney Axe did not know exactly what he was doing or that he was being influenced by his two sons who accompanied him. The bank officer who testified as petitioner's witness saw little change in respondent's physical appearance, believed that he knew what he was doing, his answers to all questions were responsive, and there wasn't anything that "seemed out of order." Certainly Burney Axe can aid his sons to the very utmost in the conduct of the business which he turned over to them, and there is no evidence in this record that he does not know the value of $100,000 just as well as $1.

Careful consideration of this whole record convinces the hearing judge that the petitioner is primarily interested in her father's money, in how much she can get for herself, and in making certain that she holds to a minimum all his gifts to her brothers, whether made inter vivos or by will. Burney Axe has been a most generous father, but his generosity seems to have fostered neither gratitude nor love in the heart of his daughter, Lillian. Her reaction is that of a spoiled child concerned only with such material gifts as she

can obtain from her father currently and in the future. She admits that she is estranged from her brothers, and has not spoken to Burton since 1959 despite the acknowledged distress it caused her mother. Her lack of love and respect for her father is evidenced by the venomous letter which she wrote him just prior to her mother's death, and in which she defamed her brothers and their families in scurrilous terms. She upbraided her father for his affection shown to her brothers, who, according to her, were not living in accordance with Jewish law, audaciously congratulated him on having her, a daughter, who could "teach [him] how to follow the Lord, God," but consciously or unconsciously she exhibited complete indifference to the fifth commandment of the Decalogue, "Honor thy father and thy mother . . .": Exodus 20:12.

What was approved by our Supreme Court in commenting on an earlier guardianship act is most appropriate here. "[W]e must not lose sight of the basic principle involved . . . that a man may do what he pleases with his personal estate during his life. He may even beggar himself and his family if he chooses to commit such an act of folly. When he dies, and then only, do the rights of his heirs attach to his estate. The Act of June 19, 1901, P. L. 574, has not changed the law in this respect one iota. Before an estate can be taken from the owner and transferred to a guardian, it must be established that the respondent is so weak in mind that he is unable to take care of his property, and in consequence thereof is liable to dissipate or lose the same and to become the victim of designing persons. The act is for the protection of the respondent and is not intended to prevent the owner of an estate from doing with his own what he pleases in order that his children may inherit a greater amount. Nor is favoritism of one child over another evidence that the respondent is a victim of a designing person, for

a parent may make such distribution among his children as he may see fit, either during life or by will after his death, so long as it is the free and conscious act of a sane mind. Applications of this nature are not to be encouraged and should not be granted except in a clear case": Bryden's Estate, 211 Pa. 633, 636.

As stressed by President Judge Keller in Ryman's Case, supra, p. 218, and often quoted with approval by our Supreme Court, this is "a proceeding to determine whether the respondent [is] so mentally defective that he [is] incapable of taking care of his property, etc. One's mental capacity is best determined by his spoken words, his acts and conduct." The hearing judge has carefully weighed all the evidence and has measured Burney Axe's appearance before him by the above directive. Respondent's rights should not be tampered with by technical motions which tend to abort a full hearing, so the motion to discontinue and the motion to dismiss are both denied.

I find as a fact that Burney Axe is not suffering from mental infirmities of old age, or from mental deficiency, or from mental illness. I further find that he is not liable to dissipate his property or to become the victim of designing persons.

I hold that Burney Axe is fully competent to manage his own property, and he is not incompetent within the meaning of the Incompetents' Estates Act of 1955, as amended.

Accordingly, I enter the following

*Decree*

And now, February 3, 1964, petitioner's prayer for the appointment of a guardian for Burney Axe is denied and her petition to have the said Burney Axe adjudged an incompetent is dismissed. Costs are placed on petitioner.