In re Gaydos

*William P. Kelly*, for petitioner.
*Ernest P. Walker*, for exceptants.

O'KICKI, *J.*, March 11, 1980—Anna Gaydos, the alleged incompetent, is presently a patient at Laurel Crest Manor, Ebensburg, a skilled geriatric nursing center. She had previously been admitted to Mercy Hospital from October 22, 1978 to November 10, 1978; again from February 9, 1979 to March 2, 1979; and from May 26, 1979 to August 8, 1979, when she was transferred to Laurel Crest Manor.

Anna Gaydos never married and her next of kin are petitioner, Viola Halpin, two sisters, Julia Gal-

lus and Matilda Staehr, and a brother, Andrew Gaydos.

Anna Gaydos has been suffering from a number of physical ailments: cortical atrophy, Parkinson's Disease, osteo and degenerative arthritis, arteriosclerotic heart disease, and for more than six months prior to the filing of the within petition, has been afflicted with organic brain syndrome, which is an irreversible condition causing continual damage to the brain.

On May 25, 1979, one day before her current admission to the hospital, Anna Gaydos conveyed her only asset, an undivided one-half interest in real estate located at 1023 McKinley Avenue, to her sister, Julia Gallus, without any consideration passing.

From the testimony and exhibits, the court makes the following findings:

1. Anna Gaydos is an unmarried elderly woman who until May 26, 1979, resided at 1023 McKinley Avenue in Johnstown, Cambria County, Pa.

2. Prior to May 25, 1979, Anna Gaydos held a one-half interest in the premises known as 1023 McKinley Avenue.

3. In 1960, this property was passed by devise from Anna Gaydos' father to her and her sister, Viola Gaydos, as tenants in common.

4. On the eve of Viola's marriage in 1965, at the request of Anna Gaydos, Viola and Anna converted the tenancy in common to joint ownership with the right of survivorship.

5. In 1976, Anna's other sister, Julia Gallus, moved in to the upper apartment at 1023 McKinley Avenue, Anna Gaydos continuing to live in the first floor apartment.

6. Julia Gallus did not pay rent or other charges

for her occupancy of the upper apartment from the initial occupancy of the premises to the present time.

7. Julia Gallus testified that occasionally she would help pay some of the bills, and also that she cashed Anna's retirement and Social Security checks and used them for her and Anna's benefit.

8. Julia Gallus did care for Anna by furnishing meals and generally helping her.

9. Julia Gallus arranged to have her brother, Andrew Gaydos, who is retired on disability from the Bethlehem Mills, come and "watch" Anna for two hours a day while Julia went to the Senior Citizens' Center for recreation. Julia paid Andrew $165 a month to "watch" his sister.

10. Anna Gaydos was admitted to Mercy Hospital in Johnstown on October 22, 1978. The medical and hospital reports indicated that she was confused and disoriented as to time and place. There was indication in the medical record that she was still disoriented when she left to return home on November 10, 1978.

11. Ann Gaydos was again admitted to Mercy Hospital on February 9, 1979.

a. On February 11, 1979, she was seen by her attending physician, Dr. Srivastava, who wrote on that day: "She is also disoriented to time and place and she does not know where she is."

b. Dr. Srivastava, an internist, arranged for a consultation with Dr. Burgbacher, a psychiatrist; his report of his meeting with Anna Gaydos on February 21, 1979, reads in part: "69 year old single white female with diagnosis of depression. Patient is very confused. Is a poor historian. She doesn't know how long she has been here. She is disoriented as to place and time. Past memory, as well

as recent memory, is poor. She can't remember who is the President. She could not remember her telephone number. She could not remember when she stopped working. She knows her parents died when she was young, but could not say how old she was. In fact, she can't say how old she is now or when her birthday is. Impression: OBS, (meaning organic brain syndrome). Prescription for Haldol 0.5 mgs. BID may help some, but her prognosis is poor."

c. Following Dr. Burgbacher's consultation of February 21, 1979, Anna Gaydos was referred to William E. Palmer, M.D., who performed cerebral tomographic studies; his report of February 22, 1979, stated: "Clinical history marked confused; disoriented. Admitted to Mercy Hospital February 9, 1979, for depression. The date of this CAT scan of the head is February 22, 1979. The report says computerized tomograms of the brain without and following the infusion of 300 ccs. of Quinoamdip reveal ventricular enlargement compatible with cerebral atrophy. Examination reveals areas of decreased density adjacent to the superior portions of the lateral ventricals in both cerebral lobes that probably represent old cerebral infarctions but there is no abnormal enhancement making recent infarct or tumor rather unlikely. Conclusion: Cerebral atrophy, moderately severe, old infarcts."

d. On February 23, 1979, Dr. Frank A. Chianese of the Mercy Hospital Department of Electroencepholography conducted a study of Anna Gaydos and made the following report: "Impression: abnormal electroencephologram which is relatively diffuse and consistent with senescent changes."

e. After the discharge of Anna Gaydos on March 2, 1979, Dr. Srivastava summarized the condition of Anna Gaydos as follows: "Miss Gaydos, who is 69

years of age, had been hospitalized because of marked depression. The patient had also been hospitalized here earlier, she was discharged to go home. She had been feeling better for awhile, but again she was markedly depressed and she was brought back by her sister. The patient was confused, she was disoriented in time and place, and she was admitted to the hospital. The patient, during the course of hospitalization, was treated symptomatically. She had a consultation with Dr. Burgbacher, who diagnosed her as organic brain syndrome and the prognosis was poor."

f. Physicians' progress notes written by Dr. Srivastava for the February 1979 admission indicate that except for one day (February 14, 1979) Anna Gaydos was confused and disoriented during her entire stay and was discharged to go home in that condition.

g. The notes of the nurses who cared for her during the February 1979 admission also indicate that up until the time of her discharge at 2 p.m. on March 2, 1979, Anna Gaydos was agitated and confused and required a "posey," a restraining jacket.

12. Respondents, Andrew Gaydos and Julia Gallus, brother and sister, testified that Anna Gaydos was lucid and competent in between her hospitalizations. Due weight and consideration is given to the perpetual optimism of family members in viewing the slowly evolving daily changes of a sick relative's condition and although Andrew Gaydos and Julia Gallus believed that Anna Gaydos made great strides after leaving the hospital, a fair evaluation of the medical reports compel the factual conclusion that Anna Gaydos did not recover from her confusion or disorientation during her times at home.

13. On May 25, 1979, Anna Gaydos transferred her interest in the McKinley Avenue property to her sister, Julia Gallus. The record indicates that this was done at the urging and arrangement of their brother, Andrew Gaydos, who said on the witness stand that he and his wife had taken care of his father-in-law before his death and "never got nothing out of it," and didn't want to see the same thing happen to Julia Gallus.

14. The transfer of property on May 25, 1979, was as a gift without consideration in money or any other thing of value. Robin Gahagan Rozsi, a lawyer's secretary, testified candidly that Anna Gaydos knew the scrivener's father, had worked for 40 years at Levi's Sport Shop and understood the fact that she was conveying her real property.

15. Anna Gaydos was again hospitalized on May 26, 1979, at 3:22 p.m. the very next day after signing the deed to Julia Gallus.

16. Dr. Soboto, the doctor who examined Anna Gaydos in the Emergency Room of Mercy Hospital on May 26, 1979, indicated that the patient was responsive to pain but confused.

17. Dr. Srivastava wrote a summary of Anna Gaydos' past and present condition in her "History and Physical" which was dictated June 7, 1979. He stated: "Miss Anna Gaydos is 69 years of age and has been hospitalized here with marked confusual state. The patient is known to have cortical atrophy. She has been hospitalized here earlier and she has marked difficulty due to this cortical atrophy. She has been confused most of the time. The patient recently hospitalized in this hospital with thorough investigations being done and we could not come to any conclusion and the patient was put on medication, but there is not much improvement.

She has been doing well at home, but again she developed marked confusual state. She has been running here and there. The patient was brought to the Emergency Room where she was examined and hospitalized."

18. Concerning his conclusion that Anna Gaydos had been doing well at home, Dr. Srivastava admitted on the witness stand that he had relied entirely on the statements of Julia Gallus, the transferee, for this particular conclusion.

19. Following the admission of Anna Gaydos, the hospital progress notes of Dr. Srivastava indicate that Anna Gaydos was confused the entire duration of her stay.

20. On cross-examination, Dr. Srivastava reported:

a. "Q. Now, you had Miss Gaydos readmitted then on February 9? A. February 9, 1979 at 2:35 p.m. Q. Were there any specific symptoms upon admission that varied from the ones you already gave us, cerebral arteriosclerosis . . .? A. She had similar symptoms; she was depressed, she was weak, confused, unable to walk; she needed help in feeding; went out of the house without any reason on one or two occasions. Q. Well, from your examination of the patient during that time period, of February to early March, what did you learn about her ability to act for herself, to think, to know? A. As I mentioned earlier, the patient had these symptoms and I don't think she was ever able to take care of herself but she would have intervals. Q. You said she could not take care of herself, what does that mean to you? A. That means she cannot walk unaided; she does not know when she has to eat; she cannot cook; she cannot go to the bathroom. Q. Does she know who she was? A. She

knows who she is. Q. Does she know where she is? A. She cannot remember. Really we do intelligence tests on all the patients. The way the test is, we ask what the day is, who is president; these are common things. How to subtract 7 from 100; these are common things that we try to check and she could not answer these simple questions. She is confused most of the time but sometimes she does remember. Once you make rounds and ask her she will remember but most of the time she is confused. Q. You said lucid intervals. We are still talking about February to March; did she have lucid intervals in that period of time? A. Yes."

b. "Q. You had Miss Gaydos in the hospital from February 9 to March 2; was there any change in your original findings of hardening of the arteries; etc.? A. Yes, there was no change, except we did do a brain scan; she had atrophy of the brain, or atropsy. Q. I think we call that atrophy of the brain? A. Yes, same thing. Q. What does that mean? A. That means the brain had this convulescence, then they get atrophy. The condition is called organic brain syndrome; irreversible. Q. Does that impair the patient's ability to function? A. Yes, that does impair the ability to function and think. Q. And did you determine during this period of hospitalization that . . . A. Yes, a scan was done in Lee Hospital February 22, 1979. Q. That is, you said an irreversible process? A. Right. Q. Could you tell us what that means? A. What do you mean? Q. You mean once it started you can't stop it? A. Yes. Q. Does it get worse or better? A. Gradually gets worse. Q. If a person has this organic brain syndrome would it be your opinion that his or her mental condition would become worse with the passage of time? A. Correct.

Q. What about the lucid intervals? A. They gradually get shorter."

21. The Social Service Department of Mercy Hospital included progress notes of their work for Anna Gaydos. On June 11, 1979, Mike Kinney wrote the following note: "Patient's sister, Miss Gallus, contacted us today indicating that given patient's condition, she could no longer care for her at home. Application was placed at the CCNCC (Cambria County Nursing Care Center)."

The legal issue, patently evident in this case, is whether there is sufficient testimony to establish that the alleged incompetent, who had suffered periods of confusion and disorientation previous to the signing of a deed and who the day after signing a deed making a total gift to her sister of her interest in real estate which was her only asset of any real value, was incompetent on the day she signed the deed, after evaluating and balancing the testimony from a lawyer's secretary that the alleged incompetent was lucid and understood the import of her act with the testimony from a medical internist.

## DISCUSSION

Testimony was adduced at trial to show that Anna Gaydos is unable presently to manage her property and would be likely to dissipate it. It was further established from the medical records concerning her stay in Mercy Hospital that Anna Gaydos has been confused and disoriented at least for the entire time of two hospital stays prior to May 26, 1979. Medical testimony given orally by Dr. Srivastava and deduced from the hospital records (which were introduced without objection) indicated that the physical cause of this confusion, which was objectively manifested in an abnormal

electroencephologram, was the result of cerebral artereosclerosis, organic brain syndrome and atrophy of the brain. At a point in testimony, Dr. Srivastava characterized these as senescent changes. Our state statute, 20 Pa.C.S.A. §5501, provides:

"'Incompetent' means a person who, because of infirmities of old age, mental illness, mental deficiency or retardation, drug addiction or inebriety: (1) is unable to manage his property, or is liable to dissipate it or become the victim of designing persons; or (2) lacks sufficient capacity to make or communicate responsible decisions concerning his person."

Under either Part 1 or 2 of the legislative test, Anna Gaydos is unable to care for herself, communicate decisions concerning herself or to manager her property. A guardian for her estate is absolutely essential.

The difficult legal question in this case arises from a retrospective application of an adjudication of incompetency. Normally, an adjudication of incompetency is prospective in effect: Owens Appeal, 167 Pa. Superior Ct. 10, 74 A. 2d 705 (1950); Montgomery Trust Co. v. Griscom, 27 Del. Co. 437 (1938). It is the overriding consideration of this whole body of law to protect and conserve the incompetent's property. In Denner v. Beyer, 352 Pa. 386, 397, 42 A. 2d 747 (1945), the Chief Justice of the Supreme Court of Pennsylvania said in his opinion: "It is a serious thing to deprive any person of the control of their own property or of their right to dispose of it by will. This right will be judicially taken away from a person only after preponderating proof of his lack of mental capacity to manage his own business affairs."

This overriding consideration may in the rare case give an adjudication of incompetency a retrospective effect. In Ryman's Case, 139 Pa. Superior Ct. 212, 11 A. 2d 677 (1940), the Superior Court invalidated a will drawn up during the pendency of the incompetency proceeding. The court emphasized that in such a case, the court must proceed cautiously and only grant retrospective effect in a clear case. In Ryman, supra, the bare holding of incompetency was given effect at a later hearing contesting a will. The problem in Ryman, supra, was that the issue of incompetency prior to the adjudication was not raised at the first hearing. In the present Gaydos case, this issue was the main subject of the hearing. The medical records and particularly the written and signed observations of doctors and nurses show that Anna Gaydos suffered from confusion and complete disorientation at least from February 1979. The reports of consultations and tests established corroborative objective physical findings for these conclusions. Julia Gallus and Viola Halpin, two opposing sisters, have presented testimony. On the date of the transfer of her property interest in 1023 McKinley Avenue, Anna Gaydos deprived herself of all of her capital assets. Uncontested evidence indicated that her half interest was worth approximately $20,000. She left herself with only a small retirement income.

The requisites of a valid gift in Pennsylvania are a valid intent to make a gift and delivery of the gift. A person may be mentally incapacitated so as to be unable to establish the required intent to make a gift. Many cases have held that when the manifest justice of a case so requires it, the court may set aside transfers of property from elderly or incompetent persons: Bauman v. Reithel, 302 Pa. 239, 153 Atl. 330 (1930); Nulls Estate, 302 Pa. 64, 153 Atl.

137 (1930). The Supreme Court of Pennsylvania dealt with a similar case in Sobel v. Sobel, 435 Pa. 80, 82, 254 A. 2d 649 (1969). The court, in Sobel, supra, said:

"[W]here mental competency is at issue, the real question is the condition of the person at the very time he executed the instrument or made the gift in question. We further held [in Girsh Trust, 410 Pa. 455, 189 A. 2d 852 (1963)] that although competency is presumed and the burden is upon him who seeks to establish otherwise, the presentation of evidence tending to show lack of competency for a reasonable time before and after the critical time shifts the burden of proof to the person who alleges that the transaction occurred during an interval when the person was mentally competent."

Although there was testimony of such periodic competence from persons interested in the transfer, Julia Gallus (the recipient), Andrew Gaydos (who arranged the transfer), and Robin Gahagen (who was employed to witness the transfer and is employed as a secretary for the attorney who drew up the deed), this self-serving testimony is not sufficient in weight and credibility to overcome the irreversible damage established by expert medical findings, which indicate complete disorientation for the entire period of observation and which indicate a progressive brain disorder coupled with a poor prognosis. The fact that Anna Gaydos was readmitted to Mercy Hospital the next day after the transfer with confusion and disorientation is highly significant to this court. She has not regained her lucidity since then. The weight of medical evidence and prior diagnosis clearly rebuts characterization of a sudden accident, as Andrew Gaydos' attorney argued.

Anna Gaydos has been a frugal working woman all her life. After being beset by a progressive physical disease which enhances mental deficiency in its wake, she transferred her sole capital asset. She was incompetent on May 25, 1979, when she executed the deed of transfer. It would be manifestly unjust to deprive her of the care and comfort her assets can provide her in her time of greatest need. For aforesaid reasons the court makes the following conclusions of law:

1. Anna Gaydos is an incompetent person in need of a guardian within the meaning of 20 Pa.C.S.A. §5501.

2. Anna Gaydos was incapable of having the requisite intent to make a gift of her sole asset of real property on May 25, 1979. Therefore, the gift, although executed, is invalid, a nullity.

3. Because of her interest in maintaining a residence in Anna Gaydos' property, Julia Gallus has an interest adverse to her sister, Anna Gaydos.

## ORDER

And now, March 11, 1980, the conveyance from Anna Gaydos to Julia Gallus dated May 25, 1979, for the premises known and numbered as 1023 McKinley Avenue is declared null and void and of no legal import.